# EXHIBIT A

**MURRAY-NOLAN BERUTTI LLC**
Ronald A. Berutti
N.J. Atty. I.D. No. 023361992
136 Central Avenue, 2nd Floor
Clark, New Jersey 07066
Phone: (908) 588-2111
Attorneys for Plaintiff Kurt Dzibela
Our File No. 01103

|  |  |
|---|---|
| KURT DZIBELA,<br><br>                       Plaintiff,<br><br>v.<br><br>BLACKROCK, INC., LAWRENCE FINK, JOHN DOES 1-25; and ABC Company 1-5, said names being fictitious,<br><br>                       Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MONMOUTH COUNTY<br>Docket No. MON-L-797-23<br><br>Civil Action<br><br>**SECOND AMENDED VERIFIED<br>COMPLAINT<br>AND JURY DEMAND** |

The plaintiff, Kurt Dzibela ("Mr. Dzibela"), by and through his attorneys, Murray-Nolan Berutti LLC, with knowledge as to his own acts, and upon information and belief as to all others, complains of the defendants as follows:

### OVERVIEW

1.     Mr. Dzibela was a model employee of defendant BlackRock, Inc. ("BlackRock"). He was recruited in 2015 to join defendant as a Senior Trader and succeeded in helping to accelerate client asset growth, thus making his work profitable both for Black Rock and its clients.

2.     In or around 2018, BlackRock began to shift its focus away from seeking traditional yields for its clients, and instead began placing much more emphasis on "Environmental, Government, and Social" ("ESG") impact investing which was not necessarily

in clients' best financial interests, and management compensation became tied, in part to hitting "Diversity, Equity and Inclusion" ("DEI") targets.

3.      Further, at about that time, Black Rock, began accelerating gender and race-based promotions, and de-emphasized compensation for traders based on financial achievements for clients, but more on the discriminatory factors and factors associated with ESG investing.

4.      When Mr. Dzibela raised questions about the propriety of ESG investing, he was ignored, and ultimately Mr. Dzibela would lose his job because of his race and his having raised questions regarding ESG, as well as for exercising his medically-necessary decision not to get a COVID-19 vaccine shot, which was required of him although he was working from home most of the time and could have been reasonably accommodated with full time work at home.

5.      The result is that Black Rock violated Mr. Dzibela's rights, including those under the New Jersey Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5-2 *et seq.,* thus causing him damage.

## THE PARTIES

6.      Mr. Dzibela is an individual with an address of 9 Bentley Lane, Ocean Township, County of Monmouth, New Jersey 07712, and at all relevant times was an inhabitant of New Jersey, and his damages occurred in New Jersey.

7.      Defendant Black Rock, Inc. ("BlackRock") is an international financial institution with offices worldwide, and maintains its headquarters at 50 Hudson Yards, New York, New York 10001.

8.      Defendant Lawrence Fink is Chairman and CEO of BlackRock and maintains an office at the BlackRock headquarters.

9.     Mr. Dzibela worked at defendant's office, located at 1 University Square Drive, Princeton, New Jersey 08540, prior to the COVID-19 pandemic, and also worked from his home in New Jersey.

10.     John Does 1-25 is a fictitious name for individuals who participated in some or all of the conduct complained of herein, or related thereto, in violation of Mr. Dzibela's rights.

11.     ABC Company 1-5 is a fictitious name for legally formed entities which bore responsibility for, and/or participated in, conduct which is complained of herein or related thereto, and which was in violation of Mr. Dzibela's rights including, without limitation, third parties which evaluated Mr. Dzibela's medical exemption request.

## FACTS RELEVANT TO ALL COUNTS

12.     Mr. Dzibela began working for defendant Black Rock in 2015 as an equity finance trader on the International Equity Desk after having been recruited to join the firm.

13.     Mr. Dzibela is a heterosexual Caucasian male.

14.     At all relevant times, Mr. Dzibela was an excellent employee with excellent results.

15.     In 2018, at Internal quarterly earnings meeting, Fink, a white male, announced that there were too many white males in leadership positions.

16.     Thereafter, defendant Fink, individually and on behalf of defendant BlackRock, whose policy he was executing, began a campaign to replace white male workers based on their race and color, and promotions within BlackRock became widely tied to criteria related to skin color and gender, sexual preference and not experience or performance.

17.     Also, in or around 2018, BlackRock began shifting investment priorities for its customers, to whom it owed a fiduciary duty to generate the highest returns, by shifting

institutional investment recommendations into "Environmental, Social, and Government" ("ESG") vehicles from higher yielding and better performing investments.

18.     Mr. Dzibela openly questioned to his management about how BlackRock was supposed to sell ESG vehicles to customers when it owed the customers fiduciary duties to generate the highest returns, such that recommending ESG investments was not in the customers' best financial interests.

19.     Despite the same, the International Equity Desk, to which Mr. Dzibela moved in order to obtain better compensation opportunities, had a record year in 2019 and was up approximately 500% from 2015 when Mr. Dzibela started, all during a period where markets, generally, were generating record-breaking returns.

20.     Despite the same, Mr. Dzibela's compensation was flat while, upon information and belief, Fink and those carrying out his directives regarding ESG investments and race-based hiring policies had record personal compensation.

21.     Upon information and belief, race became a factor in BlackRock's bonus compensation schemes in or about 2018, to Mr. Dzibela's detriment.

22.     In or about 2019, Mr. Dzibela was provided with a flexible work schedule whereby he worked out of defendant's Princeton, New Jersey office.

23.     Mr. Dzibela was moved to the US Equity desk in 2020 to assist, as the US Equity desk had a lack of experienced traders who could lead and trade the book effectively.

24.     Mr. Dzibela's move to the US Equity desk occurred prior to the general outbreak of the COVID-19 pandemic.

25.     When the pandemic struck in or around March 2020, Mr. Dzibela worked exclusively from his personal residence in New Jersey and ultimately was not allowed to work in

New York, such that his place of work was strictly in New Jersey, which caused no undue hardship on BlackRock.

26.     With Mr. Dzibela at the US Equity desk, it had record profits in 2020 despite the pandemic.

27.     In or about October 2021, defendant BlackRock instituted a so-called COVID-19 vaccine mandate.

28.     Mr. Dzibela had a pre-existing medical condition that made him a candidate for a medical exemption.

29.     In or about December 2021, Mr. Dzibela provided defendant BlackRock with a Medical Exemption letter form provided by his Medical Doctor who advised against the so-called vaccine for Mr. Dzibela due to his medical condition.

30.     Defendant Black Rock denied the medical exemption, although Mr. Dzibela was working exclusively from home at the point.

31.     Defendant BlackRock could have continued providing Mr. Dzibela the reasonable accommodation of working from home but refused such accommodation because of its desire to force its employees to be injected with a so-called COVID-19 vaccine regardless of their medical condition.

32.     Further, defendants desired to replace Mr. Dzibela with a person who was not a white male, and who did not question defendant's ESG investing, and wished to use the so-called vaccine mandate as a pretext to terminate Mr. Dzibela for such reason.

33.     Thereafter, Mr. Dzibela, at the direction of defendant BlackRock resubmitted the medical exemption letter, which BlackRock advised would be re-evaluated by an outside

consultant or consultants, including but not limited to ABC Company 1-5, who utilized some or all of John Does 1-25 for such purposes.

34.     Defendant BlackRock refused to identify the name(s) of the consulting entity or the person or people who were reviewing his medical records and/or medical exemption letters.

35.     On January 12, 2022, Mr. Dzibela was advised that his medical exemption was denied.

36.     On January 15, 2022, Mr. Dzibela was given a reduced bonus from the prior year although, upon information and belief, he had earned a larger bonus, and despite his having an "Outperform" rating given to him for his work for both 2020 and 2021.

37.     Upon information and belief, the reduced bonus was provided to Mr. Dzibela because of his race, color, medical status, perceived disability, gender, sexual orientation, and/or discrete genetic characteristics.

38.     On January 13, 2022, the United States Supreme Court ruled against the continued imposition of certain so-called COVID-19 vaccine mandates.

39.     Shortly after such decision was handed down, Mr. Dzibela was advised that he was being terminated effective February 1, 2022, due to his refusal to become injected with the so-called COVID-19 vaccine because of his medical condition for which defendants refused a reasonable accommodation that already was in place, and which had not adversely affected Mr. Dzibela's performance.

40.     Defendant BlackRock now claims that Mr. Dzibela "resigned" by choosing not to be vaccinated, which is false, since Mr. Dzibela had no intention of leaving BlackRock and instead was forced out of his employment.

41.    No reasonable accommodation was offered to Mr. Dzibela, despite his previously having worked from home, where his vaccine status was irrelevant, without incident.

42.    Defendant BlackRock knew that Mr. Dzibela had twin boys with disabilities, which was one of the reasons that he was provided a flexible work schedule, and was counting on its insurance coverage to reduce the healthcare costs associated with their upbringing.

43.    Mr. Dzibela's termination, as well as his reduced compensation and benefits, was based, in whole or in part, on his race, color, medical status, perceived disability, gender, sexual orientation, familial status, and/or discrete genetic characteristics.

44.    Defendants' discrimination violated New Jersey public policy with respect to Mr. Dzibela, a New Jersey inhabitant who was working exclusively in his New Jersey home when most or all of the discrimination against him occurred.

45.    Upon information and belief, multiple individuals were hired to replace Mr. Dzibela, none of whom had Mr. Dzibela's qualifications or experience, but which individuals better fit defendants' discriminatory DEI policy preferences.

46.    By reason of the foregoing, Mr. Dzibela has suffered financial, psychological, and physical damage.

## FIRST COUNT
### (Law Against Discrimination--Color)

1.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.    Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's color.

3.      Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4.      Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 *et seq.* ("NJLAD").

5.      By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally as follows:

A.      Awarding compensatory damages;

B.      Awarding punitive damages;

C.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.      Awarding interest as allowed by law;

E.      Awarding such other and further relief as may be equitable and just.

### SECOND COUNT
### (New Jersey Law Against Discrimination – Disability)

1.      The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.      Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's race.

3.      Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4.     Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 *et seq.* ("NJLAD").

5.     By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally as follows:

      A.     Awarding compensatory damages;

      B.     Awarding punitive damages;

      C.     Awarding all costs of suit, including reasonable attorneys' fees and costs;

      D.     Awarding interest as allowed by law;

      E.     Awarding such other and further relief as may be equitable and just.

### THIRD COUNT
### (Law Against Discrimination—Race)

1.     Mr. Dzibela repeats and reasserts each and every allegation above as if fully set forth herein at length.

2.     Defendants perceived Mr. Dzibela to be suffering with a disability based on his medical status including, without limitation, his status of being uninjected with the so-called COVID-19 vaccine.

3.     Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct, all in violation of the NJLAD.

4.      By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in her favor, and against defendants, jointly and severally, as follows:

      A.      Awarding compensatory damages;

      B.      Awarding punitive damages;

      C.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

      D.      Awarding interest as allowed by law;

      E.      Awarding such other and further relief as may be equitable and just.

### FOURTH COUNT
**(New Jersey Law Against Discrimination - Predisposing Genetic Characteristics)**

1.      Mr. Dzibela repeats and reasserts each and every allegation above as if fully set forth herein at length.

2.      Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of defendant Black Rock, based on Mr. Dzibela's Predisposing Genetic Characteristics related to his vaccination status.

3.      Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct, all in violation of the NJLAD.

4.      By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

        A.     Awarding compensatory damages;

        B.     Awarding punitive damages;

        C.     Awarding all costs of suit, including reasonable attorneys' fees and costs;

        D.     Awarding interest as allowed by law;

        E.     Awarding such other and further relief as may be equitable and just.

## FIFTH COUNT
### (Law Against Discrimination—Gender)

1.     The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.     Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's gender.

3.     Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4.     Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 *et seq.* ("NJLAD").

5.     By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

        A.     Awarding compensatory damages;

B.     Awarding punitive damages;

C.     Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.     Awarding interest as allowed by law;

E.     Awarding such other and further relief as may be equitable and just.

## SIXTH COUNT
### (Law Against Discrimination – Sexual Orientation)

1.     The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.     Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's sexual orientation.

3.     Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4.     Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 *et seq.* ("NJLAD").

5.     By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

A.     Awarding compensatory damages;

B.     Awarding punitive damages;

C.     Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.     Awarding interest as allowed by law;

E.    Awarding such other and further relief as may be equitable and just.

## SEVENTH COUNT
### (Law Against Discrimination-Familial Status)

1.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.    Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's familial status, *to wit*, the accommodation he was being given in order to better take care of his children with disabilities.

3.    Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4.    Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 *et seq.* ("NJLAD").

5.    By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.    Awarding interest as allowed by law;

E.    Awarding such other and further relief as may be equitable and just.

## EIGHTH COUNT
### (Intentional Infliction of Emotional Distress)

1.      Mr. Dzibela repeats and reasserts each and every allegation above as if fully set forth herein at length.

2.      Defendants' actions as aforesaid were purposeful, willful and/or reckless, and were intolerable in a civilized society.

3.      Such acts purposely targeted Mr. Dzibela for discrimination and with the threat that he would be forced to place his health at risk in order to maintain his job and career without reasonable justification or excuse.

4.      By such acts, defendants caused severe emotional distress to Mr. Dzibela, resulting in their proximately causing him damages.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

    A.      Awarding compensatory damages;

    B.      Awarding punitive damages;

    C.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

    D.      Awarding interest as allowed by law;

    E.      Awarding such other and further relief as may be equitable and just.

## NINTH COUNT
### (Declaratory Judgment, N.J.S.A. 2A:16-59)

1.      Mr. Dzibela repeats and reasserts each and every allegation above as if fully set forth herein at length.

2.      A dispute exists between the parties hereto related to the safety and effectiveness of so-called COVID-19 vaccines, whether a private entity's compulsory injection with the same

violates law, and whether a private entity may override the medical decision of an individual's medical doctor in order to force them to choose between accepting a vaccine at risk to life and health, or to lose employment.

3. All interested parties-in-interest are named herein so that complete relief may be awarded pursuant to the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-59 *et. seq.*

4. Defendant's purported vaccine mandate policy (the "Policy") violates 21 U.S.C. § 300bbb (the "Statute"), since all available so-called COVID-19 vaccines are Emergency Use Authorized ("EUA"), such that no person can be coerced to take such vaccines.

5. Further, under the Food and Drug Administration's ("FDA") informed consent regulation, 45 C.F.R. § 45.116(b)(8) (the "Regulation"), a person refusing an EUA vaccine cannot be discriminated against. Pursuant to the Statute's "informed consent" provision, any person given the option to take an EUA product, be it a vaccine, a drug, or a therapy, has an absolute right to refuse such EUA product.

6. Pursuant to the Regulation: **"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled,"** is required whenever an individual is offered a so-called COVID-19 vaccine.

7. Since only EUA vaccines are available, the Policy cannot coerce or penalize those who refuse vaccination.

8. All or virtually all presently available purported COVID-19 vaccines are available only because they have received EUA approval by the FDA pursuant to the Statute.

9. Although the FDA has given full, unconditional approval for two COVID-19 vaccines, those two being Pfizer's Comirnaty and Moderna's Spikevax, neither such vaccine is presently being manufactured or otherwise is available to the public except, possibly, in extremely limited quantities.

10. Indeed, if Comirnaty and Spikevax were being manufactured and were generally available to the public, then pursuant to the Statute, Pfizer, Moderna, and Johnson & Johnson would no longer be permitted to distribute their EUA authorized vaccines, as non-EUA vaccines would be available for use.

11. If non-EUA vaccines were made available, then these pharmaceutical manufacturers would lose their immunity for use.

12. Since only EUA vaccines are available, defendants cannot employ the Policy to coerce or penalize those who refuse vaccination, including Mr. Dzibela.

## A. The So-Called COVID-19 Vaccines are not Effective.

13. Moreover, the purported vaccines are neither safe nor effective based on traditional metrics of safety and effectiveness.

14. In 2017, the FDA published proposed guidance as to truth in advertising which would have required that if a product's effectiveness is to be advertised, the pharmaceutical company should base such effectiveness on the Absolute Risk Reduction ("ARR") of the product, which is a percentage of those receiving a benefit from the product as measured against the entire population of those administered the product in the pharmaceutical study.

15. In such proposed guidance, the FDA suggested that for proof of effectiveness, the Relative Risk Reduction ("RRR") should not be used or, if used, should be compared to the ARR.

16.     The RRR merely compares the number of people in the study who receive the product and still become infected with those in the study who were not administered the product and became infected with SARS-CoV-2 ("SARS-2"), the virus which sometimes causes COVID-19.

17.     Therefore, in the Covid-19 testing studies of the so-called Covid-19 vaccines, the RRR was a measurement merely of those who were not administered the so-called vaccine, and who thereafter tested positive for SARS-2 in greater numbers as compared to those who received the so-called vaccine who tested positive.

18.     The so-called COVID-19 vaccines that have been approved for EUA, according to the pharmaceutical companies' own published trial data, all had a very low possibility of providing a personal benefit to individuals in general even in optimal, pre-variant, circumstances. As will be detailed below, variants make the so-called vaccines even less effective and, perhaps, completely worthless.

19.     More specifically, the studies of the three available EUA shots were commonly being touted as being around 95% effective, which was the RRR. However, that ARR for each was below 2%, and for Pfizer it was below 1% in its own published data.

(i)     **The Pfizer study.**

20.     On December 10, 2020, an article published in the *New England Journal of Medicine*, titled "Safety and Efficacy of BNT162b2 mRNA Covid-19 Vaccine", which details the results of Pfizer's clinical study of its commonly available EUA vaccine.

21.     The authors therein noted that there was a total of 43,548 participants in the study, all of whom received injections. 21,720 received the Pfizer vaccine, and the remaining 21,728 received a placebo.

22.     Of the 21,720 participants who received the so-called vaccine, only 8 came down with cases of COVID-19 at least 7 days after the second dose. Of those receiving the placebo, only 162 cases of COVID-19 were reported after at least 7 days.

23.     **Relative to placebo**, there were 154 fewer cases of COVID-19 among those injected with the Pfizer shot versus those receiving placebo (162-7). Thus, the RRR is calculated as 154/162, or 95%. Such percentage is the commonly used "effectiveness" percentage which is purported to the general public.

24.     However, **the Pfizer ARR--meaning the percentage of people across the entire study who actually benefitted from the Pfizer vaccine -is calculated at 154/21,270, or a mere 0.73% (rounding up) effectiveness rate.**

25.     Another way of looking at this number is that **more than 138 individuals must be vaccinated for 1 person to receive a benefit** from the vaccine (21,270/154).

26.     Thus, the Pfizer vaccine, under the optimal pre-variant circumstances of the time, was barely effective at all in terms of reducing the risk that a person receiving the shot **actually** would receive a benefit from the shot. **Such calculations are from use of Pfizer's own clinical data.**

### (ii)     The Moderna study.

27.     On December 30, 2020, a study was published in the *New England Journal of Medicine*, titled "Efficacy and Safety of the mRNA-1273 SARS-CoV-2 Vaccine".

28.     The article details that of the total of 30,420 participants in the study was broken down into equal numeric groups of 15,210 participants, half who received the Moderna shot, and the other half who received a placebo.

29.     Of those injected with the Moderna shot, only 11 participants tested positive for SARS-2 after at least 14 days. Of those receiving a placebo, only 185 participants tested positive for SARS-2. Consequently, a total of 174 people benefitted from the Moderna shot (185-11), when compared relatively to placebo. Thus, the highly discussed RRR benefit of the vaccine is calculated as 174/185, or 94%.

30.     However, **the ARR is calculated as 174/15,210, or a mere 1.15% (again, giving Moderna the benefit of the doubt, and rounding up).**

31.     Another way of looking at this is that **more than 87 people have to be vaccinated for 1 person to receive a benefit.** (15,210/174).

### (iii)     The Johnson & Johnson study.

32.     On June 10, 2021, in the *New England Journal of Medicine*, titled "Safety and Efficacy of Single-Dose Ad26.COV2.S Vaccine against Covid-19".

33.     Johnson & Johnson injected 19,630 participants with their shot, and 19,681 with placebo.

34.     Relative to those receiving placebo, a total of 116 of those who were vaccinated tested positive for SARS-2 within at least 14 days thereafter, compared to 348 in the placebo group. Thus, 232 people injected with the vaccine benefitted from receiving the vaccine (348-116). Consequently, the RRR for the Johnson & Johnson vaccine is calculated as 232/348, or 67% (rounding up).

35.     After at least 28 days, 66 of those receiving the vaccine tested positive for SARS-2, while 193 cases were recorded in the placebo group, thus constituting a net relative benefit to 127 people (193-66). Thus, after at least 28 days, the RRR for the Johnson & Johnson vaccine is calculated as 127/193, or 66% (rounding up).

36.     Giving Johnson & Johnson the full benefit of the doubt by adding the 14 and 28 day beneficial recipient number together (232+127), the Johnson & Johnson shot provided an actual benefit to 359 individuals. Thus, **ARR--the percentage of people who received that shot who actually received a benefit from the vaccine--is calculated as 359/19,630, or a mere 1.83%.**

37.     Another way of looking at these numbers is that more **than 54 people must be vaccinated for 1 person to receive a benefit.**

38.     Regardless of which so-called vaccine is taken, it now is well known that those receiving only two shots are not protected by those shots at all in terms of testing positive for SARS-2 or spreading SARS-2.

39.     Moreover, even those with two booster shots test positive for SARS-2, including Anthony Fauci, M.D., who is perhaps the greatest proponent in the world of the so-called vaccine, yet who twice tested positive for SARS-2 exposure, and who contracted COVID-19, after receiving two booster shots.

40.     Indeed, on July 21, 2022, it was announced that President Joseph R. Biden had contracted COVID-19.

41.     President Biden is a proponent of the so-called COVID-19 vaccines and boosters who claims to have received two doses of COVID-19 shots and two boosters, yet now is in quarantine to avoid causing spread as he attempts to recover from the illness.

42.     Being fully up to date with boosters does not prevent death, as the unfortunate passing from COVID-19 of former Secretary of State Colin Powell attests.

**B. The So-Called COVID-19 Vaccines are not Safe.**

43.      There have been a far greater number of vaccine-associated deaths reported to the

Vaccine Adverse Effects Reporting System (VAERS) in 2021--during the first three quarters of

the year only--than in any of the last 30 years in the operation of the VAERS system. **Fully half**

**of the vaccine-related deaths that have ever been reported to VAERS since 1990, have**

**occurred in 2021.**

44.      Normally, 120-150 total vaccine-related deaths are reported to VAERS *annually*.

However, between December 14, 2020, when the Pfizer shot was rolled out, and March 1, 2023,

VAERS has received reports of 19,476 deaths, a number which rises weekly.

45.      Another way of understanding the potentially grave danger presented by the

COVID-19 shots is that it has been reported that during the entire *twenty-year* period of the

Afghanistan and Iraq wars combined, through October 2021, a total of 7,054 United States

Military forces were killed. The number of reports of death received by VAERS in *under two*

*years is more than double that of the Afghanistan/Iraq wars*.

46.      In additions to deaths, the CDC has received thousands of reports of COVID-19

shot injuries, many of which are serious, life-threatening, and life-altering, such as myocarditis,

pericarditis, anaphylaxis, thrombosis with thrombocytopenia syndrome, and Guillain-Barré

syndrome, among dozens of other injuries, and safety data trickling out of the pharmaceutical

companies shows their knowledge of many other adverse events which are attributable to the

vaccines as well, including such things as stillbirths and fertility problems.

47.      According to OpenVAERS.com, a private organization that posts publicly

available CDC/FDA data of injuries reported post-vaccination, it is believed that over the life of

the VAERS system being in place, reporting is as low as 1%. But even if reporting was at 50%,

that would translate to over 34,000 COVID-19 shot deaths in under two years since the rollout of the Pfizer shot.

48.    Indeed, the COVID-19 shots are not actually vaccines at all in the traditional sense, and they are not capable of giving a person immunity from the SARS-2 virus. Instead, those receiving such purported vaccines will continually have to get booster shots to keep up with the ever-changing SARS-2 virus, while the unvaccinated will likely develop natural immunity, which multiple studies show to be superior to vaccine 'immunity'.

49.    The compulsory vaccine requirement in the Policy of blanket vaccination is flawed, as mimicked vaccination and artificial immunity leads to a worse response than natural immunity, and vaccination has led to persistent physiological effects from damaging RNA into otherwise health human cells.

50.    Under the circumstances, the Policy violates the statutory rights of every single Black Rock employee or former employee, such as Mr. Dzibela, who was subjected to its vaccination requirement.

WHEREFORE, Mr. Dzibela demand judgment in his favor, and against the defendants, as follows:

A. Declaring the Policy to be illegal pursuant to the Statute and/or the Regulation;

B. Restraining and enjoining defendant BlackRock from enforcing the Policy;

C. Declaring that all employees who purportedly were terminated due to the Policy were wrongfully terminated;

D. Declaring that the so-called COVID-19 vaccines are not safe or effective;

E. Awarding Mr. Dzibela reasonable attorneys' fees and costs;

F.  Awarding interest as allowed by law;

G. Granting such other and further relief as is equitable and just.

## JURY DEMAND

Trial by jury of twelve (12) persons is demanded on all counts so triable.

## DESIGNATION OF TRIAL COUNSEL

The plaintiff hereby designates Ronald A. Berutti as trial counsel in this matter.

MURRAY-NOLAN BERUTTI LLC

*Ronald A. Berutti*

By:_____

Ronald A. Berutti

Dated: March 21, 2023

## VERIFICATION

KURT DZIBELA, of full age, verifies the following under penalty of perjury:

I am the plaintiff in the within matter. I have reviewed the Complaint and known the

contents thereof, which I know to be true, except with respect to those acts which are not my

own, which I believe to be true.

Kurt Dzibela

Dated: March 14 , 2023