IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KURT DZIBELA, | Case No. 3:23-cv-02093-PGS-JBD |
| Plaintiff, | **THIRD AMENDED VERIFIED COMPLAINT AND JURY DEMAND** |
| v. | |
| BLACKROCK INC., LAWRENCE FINK, and JOHN DOES 1-23, ABC Company 1-5, | |
| Defendants. | |

The plaintiff, Kurt Dzibela ("Mr. Dzibela"), by and through his attorneys, Murray-Nolan Berutti LLC, with knowledge as to his own acts, and upon information and belief as to all others, complains of the defendants as follows:

## OVERVIEW

1.      Mr. Dzibela was a model employee of defendant BlackRock, Inc. ("BlackRock"). He was recruited in 2015 to join defendant as a Senior Trader and succeeded in helping to accelerate client asset growth, thus making his work profitable both for Black Rock and its clients.

2.      In or around 2018, BlackRock began to shift its focus away from seeking traditional yields for its clients, and instead began placing much more emphasis on "Environmental, Government, and Social" ("ESG") impact investing which was not necessarily in clients' best financial interests, and management compensation became tied, in part to hitting "Diversity, Equity and Inclusion" ("DEI") targets.

3.      Further, at about that time, Black Rock, began accelerating gender and race-based promotions, and de-emphasized compensation for traders based on financial achievements for clients, but more on the discriminatory factors and factors associated with ESG investing.

4.      When Mr. Dzibela raised questions about the propriety of ESG investing, he was ignored, and ultimately Mr. Dzibela would lose his job because of his race and his having raised questions regarding ESG, as well as for exercising his medically-necessary decision not to get a COVID-19 vaccine shot, which was required of him although he was working from home most of the time and could have been reasonably accommodated with full time work at home.

5.      All of such actions were the direct and proximate result of BlackRock founder, Chairman, and CEO Lawrence Fink's ("Fink") relentless push for discriminatory ESG and related Diversity, Equity & Inclusion ("DEI") policies which created a hostile work environment and ultimately resulted in Mr. Dzibela's termination. The result is that Black Rock and Fink violated Mr. Dzibela's rights, including those under the New Jersey Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5-2 *et seq.*, and under the   *Conscientious Employee Protection Act,* ("CEPA"), *N.J.S.A.* 34:19-1 *et seq.,* thus causing him damage.

## **THE PARTIES**

6.      Mr. Dzibela is an individual with an address of 9 Bentley Lane, Ocean Township, County of Monmouth, New Jersey 07712, and at all relevant times was an inhabitant of New Jersey, and his damages occurred in New Jersey.

7.      Defendant Black Rock, Inc. ("BlackRock") is an international financial institution with offices worldwide, and maintains its headquarters at 50 Hudson Yards, New York, New York 10001.

8.      Defendant Fink is Founder, Chairman and CEO of BlackRock and resides in North Salem, New York.

9.      Mr. Dzibela worked at defendant's office, located at 1 University Square Drive, Princeton, New Jersey 08540, prior to the COVID-19 pandemic, and also worked from his home in New Jersey.

10.     John Does 1-25 is a fictitious name for individuals who participated in some or all of the conduct complained of herein, or related thereto, in violation of Mr. Dzibela's rights.

11.     ABC Company 1-5 is a fictitious name for legally formed entities which bore responsibility for, and/or participated in, conduct which is complained of herein or related thereto, and which was in violation of Mr. Dzibela's rights including, without limitation, third parties which evaluated Mr. Dzibela's medical exemption request.

## JURISDICTION AND VENUE

12.     Jurisdiction is appropriate pursuant to 28 U.S.C. § 1332, since the plaintiff has complete diversity with all defendants, and the amount in controversy exceeds $75,000.

13.     Venue is appropriate pursuant to 28 U.S.C. § 1391, since the plaintiff resides in New Jersey, and a substantial part of the errors or omissions giving rise to the claims occurred in the District of New Jersey.

## FACTS RELEVANT TO ALL COUNTS

14.     Mr. Dzibela began working for defendant Black Rock in 2015 as an equity finance trader on the International Equity Desk after having been recruited to join the firm.

15.     Mr. Dzibela is a heterosexual Caucasian male who has experienced medical problems associated with being vaccinated.

16.     At all relevant times, Mr. Dzibela was an excellent employee with excellent results.

17.     In 2018, at Internal quarterly earnings meeting, Fink, a white male, announced that there were too many white males in leadership positions, and began a campaign whereby employees in BlackRock would be judged based on discrete factors such as race, gender, and sexual orientation for "diversity, equity, and inclusion" ("DEI") purposes which violated statues and laws of the United States and New Jersey.

18.     Also, in or around 2018, BlackRock began shifting investment priorities for its customers, to whom it owed a fiduciary duty to generate the highest returns, by shifting institutional investment recommendations into "Environmental, Social, and Government" ("ESG") vehicles from higher yielding and better performing investments, in violation of law and public policy.

19.     Fink's goal and his promotion of illegal and inappropriate DEI and ESG policies by using BlackRock's investment capital to "train" corporations as to what Fink, personally, views as "acceptable behavior," which in turn would steer public policy in a new direction toward a model where discrimination against 'non-marginalized groups' such as Caucasian, heterosexual males, including Mr. Dzibela, would be viewed as being 'acceptable.'

20.     However, at all pertinent times, such discriminatory behavior and corporate practices encouraged by Fink were and remain illegal, and all discrimination against Mr. Dzibela set forth herein was the direct and proximate result of Fink's promotion of illegal DEI and ESG policies which were discriminatory against protected classes related to, without limitation, race, gender, and disability.

21.     In keeping with his desire to promote such discriminatory practices, Fink, individually and on behalf of defendant BlackRock, began a campaign which explicitly or implicitly required management to replace and/or discriminate against protected classes of white male, heterosexual workers based on their race, color, gender, and gender identity such that promotions and financial compensation within BlackRock became widely tied to criteria related to inclusion in 'groups' which were not among such protected classes.

22.     Upon information and belief, Fink set policies which promoted and expressly or implicitly mandated elimination of employees who were white, male and heterosexual and/or discrimination against them in their compensation as part of a campaign surrounding corporate governance at BlackRock, and generally among publicly-traded corporations over which BlackRock held sway based on its multiple trillion dollars of investment capital, as reflected in annual letters published by Fink which were openly designed to steer corporate policies not only of BlackRock, but of those corporations in which it invested its investment capital.

23.     BlackRock's influence was so great, given the vast amount of investment capital it had, that failure to follow Fink's essential command of such illegal policies could result in destruction of share value and loss of executives' seats on Boards of Directors and in executive management, and its push within BlackRock was essentially a model by which Fink sought to influence other publicly traded companies to behave in hiring and compensation, although such practices violate law and public policy.

24.     On several occasions, Mr. Dzibela openly questioned management about the propriety of BlackRock's DEI policies and about how BlackRock traders were was supposed to sell ESG vehicles to customers when it owed the customers fiduciary duties to generate the highest returns and/or otherwise to act in the clients' best interests and not in the parochial

political and social interests of the corporate CEO and Chairman, such that recommending ESG investments was not in keeping with BlackRock's fiduciary duties to its clients and violated public policy, and may have violated law.

25.     Such questions were raised by Mr. Dzibela on several occasions including in one corporate strategy meeting in or about 2018 with numerous Directors who discussed the manner in which the corporate agenda was going to be steered in carrying out Fink's policies and the direction of ESG investing and DEI hiring, which is a component of ESG.

26.     Mr. Dzibela's open questioning of ESG policies was made because he reasonably believed that such investment objectives at the very least violated fiduciary responsibilities to investors and public policy, if not law.

27.     When Mr. Dzibela raised the question an awkward "mic drop" moment of silence occurred because of the obvious correctness of the question which the Directors could not address in light of the policies being implemented because of Fink's open command that such policies be executed by management.

28.     Despite such policies, the International Equity Desk, to which Mr. Dzibela moved in order to obtain better compensation opportunities, had a record year in 2019 and was up approximately 500% from 2015 when Mr. Dzibela started, all during a period where markets, generally, were generating record-breaking returns.

29.     Because Mr. Dzibela was so successful, it was not reasonably feasible at such time to terminate Mr. Dzibela.

30.     Despite the same, Mr. Dzibela's compensation was flat while, upon information and belief, Fink and those carrying out his directives regarding ESG investments and race-based hiring policies had record personal compensation.

31.     Upon information and belief, race, gender, sexual orientation and sexual identiy became factors in BlackRock's bonus compensation schemes in or about 2018, to Mr. Dzibela's detriment, as a result of Fink's policies that had to be carried out within the corporation. Combined with the outspoken discriminatory intent of Fink and his subordinates who were executing his policies, a hostile work environment was created for white, heterosexual males who did not fit defendants' desired DEI profile.

32.     Moreover, Mr. Dzibela was being passed over for promotion, often by foreigners from other nations who were in New York on work visas in whole or in part because such hires increased defendants' desired DEI profile, while simultaneously discriminating against white, heterosexual men.

33.     As a result, Mr. Dzibela noted to management that he obviously was not fitting the 'criteria' for advancement, implying that he was not of the 'right' race, sex, and sexual orientation.

34.     As a result, in or about 2019, Mr. Dzibela was provided with a flexible work schedule whereby he worked out of defendant's Princeton, New Jersey office. Then in 2020, Mr. Dzibela was moved to the US Equity desk to assist, as the US Equity desk had a lack of experienced traders who could lead and trade the book effectively.

35.     Mr. Dzibela started working for the US Equity desk prior to the general outbreak of the COVID-19 pandemic. Later in the year, the move to the US Equity Desk was made official within the organization.

36.     BlackRock was not known for investing in small start-up companies. However, in or around mid-2019, BlackRock purchased some 10,000,000 shares of a new pharmaceutical company that was little known, called Moderna. Defendant's official holdings of Moderna stock

went from 568,431 shares reported in Q1 2019 to 11,740,448 shares by Q4 2019, when the first reported case of COVID-19 was on or about January 20, 2020.

37.     Months later, Moderna became a household name as it developed a purported vaccine that received Emergency Use Authority from the U.S. Food and Drug Administration, thus accelerating its share value.

38.     When the pandemic struck in or around March 2020, Mr. Dzibela worked exclusively from his personal residence in New Jersey and ultimately was not allowed to work in New York, such that his place of work was strictly in New Jersey, which caused no undue hardship on BlackRock.

39.     With Mr. Dzibela at the US Equity desk, it had record profits in 2020 despite the pandemic, such that terminating him still was not reasonably feasible and would have been highly irresponsible.

40.     In or about October 2021, defendant BlackRock instituted a so-called COVID-19 vaccine mandate, which was a conflict of interest for the corporation in light of its heavy investment in Moderna.

41.     Mr. Dzibela also learned that at a personnel manager Director's meeting, a participant on the call raised concerns to HR in relation to the COVID policy and expressed they would be alienating, segregating, and potentially losing a larger portion of their staff as a result of such policies. The response was brief and direct to the point that they understood the risks they were taking.

42.     Upon information and belief, defendants were hoping to lose employees so that they could accelerate the process of engaging in discriminatory hiring practices centered on DEI.

43.     Mr. Dzibela had a pre-existing medical condition that made him a candidate for a medical exemption, however, in seeking an exemption Mr. Dzibela would have to reveal his private medical condition to BlackRock, despite BlackRock have no legal right to receipt of such information.

44.     In or about December 2021, Mr. Dzibela provided defendant BlackRock with a Medical Exemption letter form provided by his Medical Doctor who advised against the so-called vaccine for Mr. Dzibela due to his medical condition, which condition was expressed in the letter.

45. Defendant Black Rock denied the medical exemption and offered Mr. Dzibela no accommodation because Mr. Dzibela had a medical condition which precluded him from being vaccinated, although Mr. Dzibela was working exclusively from home at that point.

46. Upon information and belief, BlackRock's denial of the medical exemption was based, in whole or in part, on its desire to retaliate against Mr. Dzibela for having questions ESG investing and DEI policies, and because by refusing the vaccine--although for his health--Mr. Dzibela did not meet a new feature of Fink's ESG policies, which was that all employees should be vaccinated in order to meet one of such goals, which goals simultaneously enriched BlackRock due to its investments in Moderna and other vaccine manufacturers.

47. Defendant BlackRock could have continued providing Mr. Dzibela the reasonable accommodation of working from home but refused such accommodation because of its desire to force its employees to be injected with a so-called COVID-19 vaccine regardless of their medical condition.

48. Further, defendants desired to replace Mr. Dzibela with a person who was not a white male, and who did not question defendant's ESG investing, and wished to use the so-called vaccine mandate as a pretext to terminate Mr. Dzibela for such reason.

49. Thereafter, Mr. Dzibela, at the direction of defendant BlackRock resubmitted the medical exemption letter, which BlackRock advised would be re-evaluated by an outside consultant or consultants, including but not limited to ABC Company 1-5, who utilized some or all of John Does 1-25 for such purposes.

50. Defendant BlackRock refused to identify the name(s) of the consulting entity or the person or people who were reviewing his medical records and/or medical exemption letters.

51. On January 12, 2022, Mr. Dzibela was advised that his medical exemption was denied. No reason was given, but it was implied that Mr. Dzibela's medical condition was a discriminating factor in denying the exemption since it was not 'serious enough' to merit defendants' concern and, thus, was used as a factor in the ultimate decision to terminate Mr. Dzibela for not receiving a COVID-19 vaccine.

52. On January 15, 2022, Mr. Dzibela was given a reduced bonus from the prior year although, upon information and belief, he had earned a larger bonus, and despite his having an "Outperform" rating given to him for his work for both 2020 and 2021, thus furthering the hostile work environment with which he was faced.

53. Upon information and belief, the reduced bonus was provided to Mr. Dzibela because of his race, color, medical status, perceived disability, gender, sexual orientation, actual or perceived disability and/or discrete genetic characteristics.

54. On January 13, 2022, the United States Supreme Court ruled against the continued imposition of certain so-called COVID-19 vaccine mandates.

55. Shortly after such decision was handed down, Mr. Dzibela was advised that he was being terminated effective February 1, 2022, due to his refusal to become injected with the so-called COVID-19 vaccine because of his medical condition for which defendants refused a reasonable accommodation that already was in place, and which had not adversely affected Mr. Dzibela's performance.

56. Defendant BlackRock now claims that Mr. Dzibela "resigned" by choosing not to be vaccinated, which is false since Mr. Dzibela had no intention of leaving BlackRock and instead was forced out of his employment.

57. No reasonable accommodation was offered to Mr. Dzibela, despite his previously having worked from home, where his vaccine status was irrelevant, without incident.

58. Defendant BlackRock knew that Mr. Dzibela had twin boys with disabilities, which was one of the reasons that he was provided a flexible work schedule and was counting on its insurance coverage to reduce the healthcare costs associated with their upbringing.

59. Mr. Dzibela's termination, as well as his reduced compensation and benefits, was based, in whole or in part, on his race, color, medical status, perceived disability, gender, sexual orientation, familial status, and/or discrete genetic characteristics.

60. Defendants' discrimination violated New Jersey public policy with respect to Mr. Dzibela, a New Jersey inhabitant who was working exclusively in his New Jersey home when most or all of the discrimination against him occurred.

61. After being terminated, in a conversation with one of his former supervisors with intimate knowledge of the process, Mr. Dzibela was told that BlackRock is now using outside consulting firms to filter candidates and wanted to hire people based on their race, color, gender, vaccine status, sexual orientation and the like, in keeping with Fink's DEI hiring command, and that the

candidates were less qualified or unqualified because they did not have the knowledge and experience of Mr. Dzibela, yet were hired in some instances only because they fit the DEI profile.

62. Upon information and belief, multiple individuals ultimately were hired to replace Mr. Dzibela, none of whom had Mr. Dzibela's qualifications or experience, but which individuals better fit defendants' discriminatory DEI policy preferences.

63. By reason of the foregoing, Mr. Dzibela has suffered financial, psychological, and physical damage.

**FIRST COUNT**
**(Law Against Discrimination--Color)**

1. The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2. Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's color.

3. Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4. Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 *et seq.* ("NJLAD").

5. By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally as follows:

A.   Awarding compensatory damages;

B.   Awarding punitive damages;

C.   Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.   Awarding interest as allowed by law;

E.   Awarding such other and further relief as may be equitable and just.

## SECOND COUNT
### (New Jersey Law Against Discrimination-Race)

1.   The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.   Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's race.

3.   Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4.   Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 *et seq.* ("NJLAD").

5.   By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally as follows:

A.   Awarding compensatory damages;

B.   Awarding punitive damages;

C.   Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.      Awarding interest as allowed by law;

E.      Awarding such other and further relief as may be equitable and just.

### THIRD COUNT
### (Law Against Discrimination—Disability)

1.      Mr. Dzibela repeats and reasserts each and every allegation above as if fully set forth herein at length.

2.      Defendants perceived Mr. Dzibela to be suffering with a disability based on his medical status including, without limitation, his status of being uninjected with the so-called COVID-19 vaccine and/or his underlying health conditions which resulted in rejection of his medical exemption and refusal to provide him with an accomodation.

3.      More specifically, defendants perceived Mr. Dzibela as being disabled due to his COVID-19 vaccination status after demanding to understand Mr. Dzibela's health conditions which required his medical exemption, so much so that they would not offer him an accommodation.

4.      Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct, all in violation of the NJLAD.

5.      By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in her favor, and against defendants, jointly and severally, as follows:

A.      Awarding compensatory damages;

B.      Awarding punitive damages;

C.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.      Awarding interest as allowed by law;

E.      Awarding such other and further relief as may be equitable and just.

## FOURTH COUNT
### (New Jersey Law Against Discrimination - Predisposing Genetic Characteristics)

1.      Mr. Dzibela repeats and reasserts each and every allegation above as if fully set forth herein at length.

2.      Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of defendant Black Rock, based on Mr. Dzibela's Predisposing Genetic Characteristics related to his vaccination status.

3.      Scientific evidence has revealed that the COVID-19 vaccines may alter the human genome, which is the entire material within a gene, such that the vaccines are gene products, and such that discrimination based on not taking the vaccine is based on "information about genes" related to those not taking the vaccine, as confirmed by at least one qualified expert on the subject who has examined the issue for Mr. Dzibela.

4.      Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct, all in violation of the NJLAD.

5.      By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

A.      Awarding compensatory damages;

B.      Awarding punitive damages;

C.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.      Awarding interest as allowed by law;

E.      Awarding such other and further relief as may be equitable and just.

## FIFTH COUNT
### (Law Against Discrimination—Gender)

1.      The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.      Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's gender.

3.      Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4.      Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 *et seq.* ("NJLAD").

5.      By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

A.      Awarding compensatory damages;

B.      Awarding punitive damages;

C.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.      Awarding interest as allowed by law;

E.    Awarding such other and further relief as may be equitable and just.

## SIXTH COUNT
### (Law Against Discrimination – Sexual Orientation)

1.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.    Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's sexual orientation.

3.    Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4.    Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 *et seq.* ("NJLAD").

5.    By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.    Awarding interest as allowed by law;

E.    Awarding such other and further relief as may be equitable and just.

## SEVENTH COUNT
### (Law Against Discrimination-Hostile Work Environment)

1.      The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.      Defendants discriminated against Mr. Dzibela by their individual acts and on behalf of Black Rock, based on Mr. Dzibela's being a member of one or more protected classes related to, without limitation, race, color, gender, and disability.

3.      Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

4.      Such conduct, including basing compensation and/or promotion on being in one or more of such protected classifications, was unwelcome and would be regarded by a reasonable person in the same protected class to be sufficiently severe or pervasive as to alter the conditions of employment and create an intimidating, hostile, or offensive work environment

5.      Such conduct violated Mr. Dzibela's rights und the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 et seq. ("NJLAD").

6.      By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in her favor, and against defendants, jointly and severally, as follows:

    A.      Awarding compensatory damages;

    B.      Awarding punitive damages;

    C.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.  Awarding interest as allowed by law;

E.  Awarding such other and further relief as may be equitable and just.

## EIGHTH COUNT
### (Intentional Infliction of Emotional Distress)

1.  Mr. Dzibela repeats and reasserts each and every allegation above as if fully set forth herein at length.

2.  Defendants' actions as aforesaid were purposeful, willful and/or reckless, and were intolerable in a civilized society.

3.  Such acts purposely targeted Mr. Dzibela for discrimination and with the threat that he would be forced to place his health at risk in order to maintain his job and career without reasonable justification or excuse.

4.  By such acts, defendants caused severe emotional distress to Mr. Dzibela, resulting in their proximately causing him damages.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

A.  Awarding compensatory damages;

B.  Awarding punitive damages;

C.  Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.  Awarding interest as allowed by law;

E.  Awarding such other and further relief as may be equitable and just.

## NINTH COUNT
### (Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.)

1.  The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

2.      Mr. Dzibela disclosed and questioned wrongful and illegal activities of defendants which also otherwise violated public policy, which thus constituted whistleblowing activity.

3.      Retaliatory action was ultimately taken against Mr. Dzibela, in whole or in part, as a result of such whistleblowing activity.

4.      Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

5.      A nexus exists between Mr. Dzibel's engaging in such whistleblowing activity and his being terminated, such that defendants violated the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 *et seq.* ("CEPA").

6.      By such actions, defendants proximately caused Mr. Dzibela to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Mr. Dzibela demands Judgment in his favor, and against defendants, jointly and severally, as follows:

      A.      Awarding compensatory damages;

      B.      Awarding punitive damages;

      C.      Awarding any and all other damages as may be allowed by statute;

      D.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

      E.      Awarding interest as allowed by law;

      F.      Awarding such other and further relief as may be equitable and just.

## TENTH COUNT
### (Declaratory Judgment, N.J.S.A. 2A:16-59)

1.      Mr. Dzibela repeats and reasserts each and every allegation above as if fully set forth herein at length.

2.      A dispute exists between the parties hereto related to the safety and effectiveness of so-called COVID-19 vaccines, whether a private entity's compulsory injection with the same violates law, and whether a private entity may override the medical decision of an individual's medical doctor in order to force them to choose between accepting a vaccine at risk to life and health, or to lose employment.

3.      All interested parties-in-interest are named herein so that complete relief may be awarded pursuant to the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-59 *et. seq.*

4.      Defendant's purported vaccine mandate policy (the "Policy") violates 21 U.S.C. § 300bbb (the "Statute"), since all available so-called COVID-19 vaccines are Emergency Use Authorized ("EUA"), such that no person can be coerced to take such vaccines.

5.      Further, under the Food and Drug Administration's ("FDA") informed consent regulation, 45 C.F.R. § 45.116(b)(8) (the "Regulation"), a person refusing an EUA vaccine cannot be discriminated against. Pursuant to the Statute's "informed consent" provision, any person given the option to take an EUA product, be it a vaccine, a drug, or a therapy, has an absolute right to refuse such EUA product.

6.      Pursuant to the Regulation: **"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled,"** is required whenever an individual is offered a so-called COVID-19 vaccine.

7.      Since only EUA vaccines are available, the Policy cannot coerce or penalize those who refuse vaccination.

8.      All or virtually all presently available purported COVID-19 vaccines are available only because they have received EUA approval by the FDA pursuant to the Statute.

9.      Although the FDA has given full, unconditional approval for two COVID-19 vaccines, those two being Pfizer's Comirnaty and Moderna's Spikevax, neither such vaccine is presently being manufactured or otherwise is available to the public except, possibly, in extremely limited quantities.

10.     Indeed, if Comirnaty and Spikevax were being manufactured and were generally available to the public, then pursuant to the Statute, Pfizer, Moderna, and Johnson & Johnson would no longer be permitted to distribute their EUA authorized vaccines, as non-EUA vaccines would be available for use.

11.     If non-EUA vaccines were made available, then these pharmaceutical manufacturers would lose their immunity for use.

12.     Since only EUA vaccines are available, defendants cannot employ the Policy to coerce or penalize those who refuse vaccination, including Mr. Dzibela.

**A.  The So-Called COVID-19 Vaccines are not Effective.**

13.     Moreover, the purported vaccines are neither safe nor effective based on traditional metrics of safety and effectiveness.

14.     In 2017, the FDA published proposed guidance as to truth in advertising which would have required that if a product's effectiveness is to be advertised, the pharmaceutical company should base such effectiveness on the Absolute Risk Reduction ("ARR") of the

product, which is a percentage of those receiving a benefit from the product as measured against the entire population of those administered the product in the pharmaceutical study.

15.     In such proposed guidance, the FDA suggested that for proof of effectiveness, the Relative Risk Reduction ("RRR") should not be used or, if used, should be compared to the ARR.

16.     The RRR merely compares the number of people in the study who receive the product and still become infected with those in the study who were not administered the product and became infected with SARS-CoV-2 ("SARS-2"), the virus which sometimes causes COVID-19.

17.     Therefore, in the Covid-19 testing studies of the so-called Covid-19 vaccines, the RRR was a measurement merely of those who were not administered the so-called vaccine, and who thereafter tested positive for SARS-2 in greater numbers as compared to those who received the so-called vaccine who tested positive.

18.     The so-called COVID-19 vaccines that have been approved for EUA, according to the pharmaceutical companies' own published trial data, all had a very low possibility of providing a personal benefit to individuals in general even in optimal, pre-variant, circumstances. As will be detailed below, variants make the so-called vaccines even less effective and, perhaps, completely worthless.

19.     More specifically, the studies of the three available EUA shots were commonly being touted as being around 95% effective, which was the RRR. However, that ARR for each was below 2%, and for Pfizer it was below 1% in its own published data.

(i)     **The Pfizer study.**

20.     On December 10, 2020, an article published in the *New England Journal of Medicine*, titled "Safety and Efficacy of BNT162b2 mRNA Covid-19 Vaccine", which details the results of Pfizer's clinical study of its commonly available EUA vaccine.

21.     The authors therein noted that there was a total of 43,548 participants in the study, all of whom received injections. 21,720 received the Pfizer vaccine, and the remaining 21,728 received a placebo.

22.     Of the 21,720 participants who received the so-called vaccine, only 8 came down with cases of COVID-19 at least 7 days after the second dose. Of those receiving the placebo, only 162 cases of COVID-19 were reported after at least 7 days.

23.     **Relative to placebo**, there were 154 fewer cases of COVID-19 among those injected with the Pfizer shot versus those receiving placebo (162-7). Thus, the RRR is calculated as 154/162, or 95%.  Such percentage is the commonly used "effectiveness" percentage which is purported to the general public.

24.     However, **the Pfizer ARR--meaning the percentage of people across the entire study who actually benefitted from the Pfizer vaccine -is calculated at 154/21,270, or a mere 0.73% (rounding up) effectiveness rate.**

25.     Another way of looking at this number is that **more than 138 individuals must be vaccinated for 1 person to receive a benefit** from the vaccine (21,270/154).

26.     Thus, the Pfizer vaccine, under the optimal pre-variant circumstances of the time, was barely effective at all in terms of reducing the risk that a person receiving the shot **actually would receive a benefit from the shot. Such calculations are from use of Pfizer's own clinical data.**

(ii)     **The Moderna study.**

27.     On December 30, 2020, a study was published in the *New England Journal of Medicine*, titled "Efficacy and Safety of the mRNA-1273 SARS-CoV-2 Vaccine".

28.     The article details that of the total of 30,420 participants in the study was broken down into equal numeric groups of 15,210 participants, half who received the Moderna shot, and the other half who received a placebo.

29.     Of those injected with the Moderna shot, only 11 participants tested positive for SARS-2 after at least 14 days. Of those receiving a placebo, only 185 participants tested positive for SARS-2. Consequently, a total of 174 people benefitted from the Moderna shot (185-11), when compared relatively to placebo. Thus, the highly discussed RRR benefit of the vaccine is calculated as 174/185, or 94%.

30.     However, **the ARR is calculated as 174/15,210, or a mere 1.15% (again, giving Moderna the benefit of the doubt, and rounding up).**

31.     Another way of looking at this is that **more than 87 people have to be vaccinated for 1 person to receive a benefit.** (15,210/174).

(iii)     **The Johnson & Johnson study.**

32.     On June 10, 2021, in the *New England Journal of Medicine*, titled "Safety and Efficacy of Single-Dose Ad26.COV2.S Vaccine against Covid-19".

33.     Johnson & Johnson injected 19,630 participants with their shot, and 19,681 with placebo.

34.     Relative to those receiving placebo, a total of 116 of those who were vaccinated tested positive for SARS-2 within at least 14 days thereafter, compared to 348 in the placebo group.  Thus, 232 people injected with the vaccine benefitted from receiving the vaccine (348-

116). Consequently, the RRR for the Johnson & Johnson vaccine is calculated as 232/348, or 67% (rounding up).

35.     After at least 28 days, 66 of those receiving the vaccine tested positive for SARS-2, while 193 cases were recorded in the placebo group, thus constituting a net relative benefit to 127 people (193-66). Thus, after at least 28 days, the RRR for the Johnson & Johnson vaccine is calculated as 127/193, or 66% (rounding up).

36.     Giving Johnson & Johnson the full benefit of the doubt by adding the 14 and 28 day beneficial recipient number together (232+127), the Johnson & Johnson shot provided an actual benefit to 359 individuals. Thus, **ARR--the percentage of people who received that shot who actually received a benefit from the vaccine--is calculated as 359/19,630, or a mere 1.83%.**

37.     Another way of looking at these numbers is that more **than 54 people must be vaccinated for 1 person to receive a benefit.**

38.     Regardless of which so-called vaccine is taken, it now is well known that those receiving only two shots are not protected by those shots at all in terms of testing positive for SARS-2 or spreading SARS-2.

39.     Moreover, even those with two booster shots test positive for SARS-2, including Anthony Fauci, M.D., who is perhaps the greatest proponent in the world of the so-called vaccine, yet who twice tested positive for SARS-2 exposure, and who contracted COVID-19, after receiving two booster shots.

40.     Indeed, on July 21, 2022, it was announced that President Joseph R. Biden had contracted COVID-19.

41.     President Biden is a proponent of the so-called COVID-19 vaccines and boosters who claims to have received two doses of COVID-19 shots and two boosters, yet now is in quarantine to avoid causing spread as he attempts to recover from the illness.

42.     Being fully up to date with boosters does not prevent death, as the unfortunate passing from COVID-19 of former Secretary of State Colin Powell attests.

**B.  The So-Called COVID-19 Vaccines are not Safe.**

43.     There have been a far greater number of vaccine-associated deaths reported to the Vaccine Adverse Effects Reporting System (VAERS) in 2021--during the first three quarters of the year only--than in any of the last 30 years in the operation of the VAERS system. **Fully half of the vaccine-related deaths that have ever been reported to VAERS since 1990, have occurred in 2021.**

44.     Normally, 120-150 total vaccine-related deaths are reported to VAERS *annually*. However, between December 14, 2020, when the Pfizer shot was rolled out, and March 1, 2023, VAERS has received reports of 19,476 deaths, a number which rises weekly.

45.     Another way of understanding the potentially grave danger presented by the COVID-19 shots is that it has been reported that during the entire *twenty-year* period of the Afghanistan and Iraq wars combined, through October 2021, a total of 7,054 United States Military forces were killed. The number of reports of death received by VAERS in *under two years is more than double that of the Afghanistan/Iraq wars.*

46.     In additions to deaths, the CDC has received thousands of reports of COVID-19 shot injuries, many of which are serious, life-threatening, and life-altering, such as myocarditis, pericarditis, anaphylaxis, thrombosis with thrombocytopenia syndrome, and Guillain-Barré syndrome, among dozens of other injuries, and safety data trickling out of the pharmaceutical

companies shows their knowledge of many other adverse events which are attributable to the vaccines as well, including such things as stillbirths and fertility problems.

47.    According to OpenVAERS.com, a private organization that posts publicly available CDC/FDA data of injuries reported post-vaccination, it is believed that over the life of the VAERS system being in place, reporting is as low as 1%. But even if reporting was at 50%, that would translate to over 34,000 COVID-19 shot deaths in under two years since the rollout of the Pfizer shot.

48.    Indeed, the COVID-19 shots are not actually vaccines at all in the traditional sense, and they are not capable of giving a person immunity from the SARS-2 virus. Instead, those receiving such purported vaccines will continually have to get booster shots to keep up with the ever-changing SARS-2 virus, while the unvaccinated will likely develop natural immunity, which multiple studies show to be superior to vaccine 'immunity'.

49.    The compulsory vaccine requirement in the Policy of blanket vaccination is flawed, as mimicked vaccination and artificial immunity leads to a worse response than natural immunity, and vaccination has led to persistent physiological effects from damaging RNA into otherwise health human cells.

50.    Moreover, the subject policy was never intended to provide medical protection for people, but rather, was an effort by defendants to enrich themselves due to their investment in Moderna in particular, and other vaccine manufacturers generally.

51.    Under the circumstances, the Policy violates the statutory rights of every single Black Rock employee or former employee, such as Mr. Dzibela, who was subjected to its vaccination requirement.

WHEREFORE, Mr. Dzibela demand judgment in his favor, and against the defendants, as follows:

    A. Declaring the Policy to be illegal pursuant to the Statute and/or the Regulation;

    B. Restraining and enjoining defendant BlackRock from enforcing the Policy;

    C. Declaring that all employees who purportedly were terminated due to the Policy were wrongfully terminated;

    D. Declaring that the so-called COVID-19 vaccines are not safe or effective;

    E. Awarding Mr. Dzibela reasonable attorneys' fees and costs;

    F.  Awarding interest as allowed by law;

    G. Granting such other and further relief as is equitable and just.

## JURY DEMAND

Trial by jury of twelve (12) persons is demanded on all counts so triable.

## DESIGNATION OF TRIAL COUNSEL

The plaintiff hereby designates Ronald A. Berutti as trial counsel in this matter.

MURRAY-NOLAN BERUTTI LLC

*Ronald A. Berutti*

By:_____

        Ronald A. Berutti

Dated: June 8, 2023

## <u>VERIFICATION</u>

KURT DZIBELA, of full age, verifies the following under penalty of perjury:

I am the plaintiff in the within matter.  I have reviewed the Complaint and known the contents thereof, which I know to be true, except with respect to those acts which are not my own, which I believe to be true.

Kurt Dzibela

Dated: June 5, 2023