# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

KURT DZIBELA,

                    Plaintiff,

v.

BLACKROCK, INC., LAWRENCE
FINK, and JOHN DOES 1-23, ABC
Company 1-5.

                    Defendants.

Case No. 3:23-cv-02093-PGS-JBD

**Motion Day: August 7, 2023**

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ...................................................................1

II.    STATEMENT OF ALLEGED FACTS AND PROCEDURAL
       HISTORY ...............................................................................................3

       A.    Plaintiff's Employment Ended After He Violated BlackRock
             Policy.............................................................................................3

       B.    Procedural History .........................................................................5

III.   LEGAL STANDARD ...............................................................................5

IV.    LEGAL ARGUMENT...............................................................................7

       A.    Plaintiff Fails to Factually Support His Claims of
             Discrimination Based on Color, Race, Perceived Disability,
             Gender, Sexual Orientation, or Predisposing Genetic
             Characteristics. ..............................................................................7

             1.    Race, Color, Gender, and Sexual Orientation
                   Discrimination...................................................................7

             2.    Perceived Disability Discrimination.......................................14

             3.    Predisposing Genetic Characteristics Discrimination ............17

       B.    Plaintiff Fails to Allege Any Conduct Creating A Hostile Work
             Environment Based on Any Protected Class. ...................................19

             1.    Plaintiff's hostile work environment claim fails because
                   it is based solely on discrete employment actions. .................19

             2.    Plaintiff's hostile work environment claim also fails
                   because he does not plausibly allege that he experienced
                   a hostile work environment because of a protected class. .......21

             3.    Plaintiff does not allege any conduct that was so severe
                   or pervasive that it altered his work environment. ..................22

       C.    Plaintiff's Claim for Intentional Infliction of Emotional Distress
             is Legally and Factually Deficient. ..................................................23

             1.    Plaintiff's IIED claim is duplicative of and preempted by
                   his statutory claims. .........................................................23

             2.    Plaintiff alleges no factual support for his IIED claim............25

# TABLE OF CONTENTS
(continued)

**Page**

D.   Plaintiff's CEPA Claim Fails as Untimely and Lacking
Causation. ...........................................................................................28

1.   Plaintiff's CEPA claim is untimely. .......................................28

2.   Plaintiff's termination in 2022 has no connection to his
questions about ESG and DEI policies in 2018......................29

E.   Plaintiff's NJDJA Claim Fails Because It is Based on Laws for
Which There is No Private Right of Action.......................................31

F.   Plaintiff Fails to State Any Claims for Individual Liability. .............34

V.   CONCLUSION...............................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Health Inc. v. Srinivasan*,
2016 WL 3525298 (N.J. Super. Ct. App. Div. June 29, 2016) .........................34

*Anderson v. United Airlines, Inc.*,
577 F. Supp. 3d 1324 (M.D. Fla. 2021).............................................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................6, 7

*Barber v. Univ. of Med. & Dentistry of New Jersey*,
118 F. Appx. 588 (3d Cir. 2004) ......................................................................12

*Baum v. Dunmire Prop. Mgmt., Inc.*,
2022 WL 889097 (D. Colo. Mar. 25, 2022) ......................................................19

*Belfort v. Morgan Properties*, LLC,
2018 WL 3201787 (D.N.J. June 29, 2018)........................................................23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................6

*Berutti v. Wolfson*,
2023 WL 1071624 (D.N.J. Jan. 27, 2023)...................................................32, 34

*Bilinski v. Wills Eye Hosp.*,
2016 WL 6247569 (E.D. Pa. Oct. 26, 2016) .....................................................33

*Bowie v. Costco Wholesale Corp.*,
2017 WL 3168985 (D.N.J. July 26, 2017) ........................................................26

*Brennan v. Palmieri*,
2008 WL 5233782 (D.N.J. Dec. 12, 2008).........................................................38

*Browne v. Nat'l Collegiate Student Loan Tr.*,
2021 WL 6062306 (D.N.J. Dec. 22, 2021).........................................................34

*Cagno v. Ivery*,
2022 WL 17887231 (D.N.J. Dec. 23, 2022).......................................................28

*Choy v. Comcast Cable Commc'ns, LLC*,
    629 F. Appx. 362 (3d Cir. 2015) ....................................................29

*Cicchetti v. Morris Cty. Sheriff's Off.*,
    194 N.J. 563 (2008) ................................................................35, 37

*Coefield v. GPU*,
    125 F. Appx. 445 (3d Cir. 2005) ....................................................13

*Covington v. Twp. of Hillside*,
    2021 WL 4272880 (D.N.J. Sept. 20, 2021) ........................................37

*Cromwell v. Fichter*,
    2023 WL 3734969 (3d Cir. May 31, 2023).........................................37

*Cronin v. Booz Allen Hamilton Inc.*,
    2022 WL 3357869 (3d Cir. Aug. 15, 2022) ........................................26

*Dickerson v. New Jersey Inst. of Tech.*,
    2019 WL 6032378 (D.N.J. Nov. 14, 2019) .........................................13

*Dominguez v. Costco Wholesale Corp.*,
    356 Fed. Appx. 611 (3d Cir. 2009)...................................................30

*Elansari v. Univ. of Pa.*,
    779 F. Appx. 1006 (3d Cir. July 17, 2019).........................................33

*Excel Pharmacy Servs., LLC v. Liberty Mut. Ins. Co.*,
    825 F. Appx. 65 (3d Cir. 2020) ......................................................33

*Foy v. Wakefern Food Corp.*,
    2010 WL 147925 (D.N.J. Jan. 7, 2010)...............................................9

*Gaines v. United Parcel Serv., Inc.*,
    2014 WL 1450113 (D.N.J. Apr. 14, 2014)..........................................23

*Griffin v. Dep't of Hum. Servs.*,
    2019 WL 3369783 (D.N.J. July 26, 2019) ..........................................20

*Griffin v. Metromedia Energy, Inc.*,
    2011 WL 12872504 (D.N.J. Feb. 7, 2011)..........................................29

*Groeber v. Friedman & Schuman, P.C.*,
   555 F. Appx. 133 (3d Cir. 2014) ...........................................................................9

*Guzman v. M. Teixiera Int'l*,
   2023 N.J. Super. LEXIS 61 (App. Div. June 7, 2023) ......................................17

*Harden v. Honeywell Int'l, Inc.*,
   2023 WL 3310172 (N.D. Ga. May 8, 2023).......................................................19

*Hoag v. Brown*,
   397 N.J. Super. 34 (App. Div. 2007) ................................................................34

*Incorvati v. Best Buy Co.*,
   2010 WL 4807062 (D.N.J. Nov. 16, 2010) ......................................................22

*Johnson v. Mount Sinai Hosp. Grp., Inc.*,
   2023 WL 2163774 (E.D.N.Y. Feb. 22, 2023) ..................................................15

*Jorge v. City of Newark*,
   2016 WL 3461771 (N.J. Super. Ct. App. Div. June 27, 2016) ...................21, 22

*Jorgenson v. Conduent Transp. Sols., Inc.*,
   2023 WL 1472022 (D. Md. Feb. 2, 2023) ........................................................15

*Khalifeh v. Duff & Phelps Corp.*,
   2017 WL 1003220 (D.N.J. Mar. 15, 2017) ......................................................13

*King v. Port Auth. of New York and New Jersey*,
   909 F. Supp. 938 (D.N.J. 1995)........................................................................26

*Leggo v. M.C. Dean, Inc.*,
   2023 WL 1822383 (E.D. Va. Feb. 7, 2023) .....................................................15

*Mardini v. Viking Freight, Inc.*,
   92 F. Supp. 2d 378 (D.N.J. 1999).....................................................................24

*McKenna v. Verint Americas Inc.*,
   2022 WL 3211422 (D.N.J. Aug. 9, 2022) ........................................................38

*McKinley v. Princeton University et al.*,
   2023 WL 3168026 (D.N.J. Apr. 28, 2023)........................................................18

*Metzler v. Am. Transp. Grp., LLC*,
2008 WL 413311 (D.N.J. Feb. 13, 2008) ............................................................23

*Miller v. Soc. Sec. Admin.*,
412 F. Supp. 3d 491 (D.N.J. 2019) ....................................................................20

*National Railroad Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) ...........................................................................................20

*Neitzke v. Williams*,
490 U.S. 319 (1989) ...............................................................................................5

*Nguyen v. Quick Check, Store No. 129*,
2013 U.S. Dist. LEXIS 176067 (D.N.J. Dec. 16, 2013) .................................6, 9

*O'Connor v. City of Newark*,
440 F.3d 125 (3d Cir. 2006) ...............................................................................20

*Obendorfer v. Gitano Grp., Inc.*,
838 F. Supp. 950 (D.N.J. 1993) ..........................................................................27

*In re Orthopedic Bone Screw Prod. Liab. Litig.*,
193 F.3d 781 (3d Cir. 1999) ...............................................................................32

*Quarles v. Lowe's Home Centers, Inc.*,
2006 WL 1098050 (D.N.J. Mar. 31, 2006) ...................................................25, 38

*Robles v. U.S. Env't Universal Servs., Inc.*,
469 F. Appx. 104 (3d Cir. 2012) ........................................................................29

*Sangi v. Warren Hosp.*,
2011 U.S. Dist. LEXIS 117463 (D.N.J. Oct. 11, 2011) .......................................9

*Santiago v. Warminster Twp.*,
629 F.3d 121 (3d Cir. 2010) .................................................................................9

*Sgro v. Bloomberg L.P.*,
331 Fed. Appx. 932 (3d Cir. 2009).....................................................................12

*Shepherd v. Hunterdon Developmental Ctr.*,
174 N.J. 1 (2002) ................................................................................................22

*Shklyar v. Carboline Co.*,
   2022 WL 2867073 (E.D. Mo. July 21, 2022) ...................................................15

*Smith v. E. Greenwich Twp.*,
   519 F. Supp. 2d 493 (D.N.J. 2007) ...................................................................27

*Speaks v. Health Sys. Mgmt., Inc.*,
   2022 WL 3448649 (W.D.N.C. Aug. 17, 2022) ................................................15

*Taylor v. Lincare, Inc.*,
   2016 WL 3849852 (D.N.J. July 15, 2016) .......................................................12

*Together Emps. v. Mass Gen. Brigham Inc.*,
   573 F. Supp. 3d 412 (D. Mass. 2021) ..............................................................31

*Tourtellotte v. Eli Lilly & Co.*,
   636 F. Appx. 831 (3d Cir. 2016) ......................................................................22

*Turner v. Wong*,
   363 N.J. Super. 186, 832 A.2d 340 (App. Div. 2003) ................................26, 27

*Vega v. City of Brunswick*,
   171 Fed. Appx. 930 (3d Cir. 2006) ..................................................................12

*Villalobos v. Fava*,
   342 N.J. Super. 38 (App. Div. 2001) ...............................................................29

*Witherspoon v. Rent–A–Center, Inc.*,
   173 F. Supp. 2d 239 (D.N.J. 2001) .............................................................26, 27

*Young v. Schering Corp.*,
   141 N.J. 16 (1995) ............................................................................................24

**Statutes**

21 U.S.C. § 360bbb ..............................................................................................32, 34

N.J.S.A. § 10:5-5 .................................................................................................17, 18

N.J.S.A. § 10:5-12(a) ................................................................................................18

N.J.S.A. § 34:19-5 .....................................................................................................28

New Jersey Conscientious Employee Protection Act ......................................*passim*

New Jersey Declaratory Judgment Act........................................................31, 34, 39

**Other Authorities**

45 C.F.R. § 46.101 ...................................................................................33

45 C.F.R. § 46.115 ...................................................................................33

45 C.F.R. § 46.116 ..............................................................................32, 33

45 C.F.R. § 46.117 ...................................................................................33

Federal Rule of Civil Procedure 12(b)(6) ....................................5, 15, 37

## I.  **PRELIMINARY STATEMENT**

Plaintiff Kurt Dzibela's employment ended on February 1, 2022, because he refused to comply with BlackRock, Inc.'s policy requiring that employees be vaccinated against COVID-19 after his request for an exemption from the policy was denied.  In response to his separation of employment for this lawful and legitimate reason, Plaintiff initiated this action and has made four attempts at a pleading – and yet the Third Amended Complaint still fails to state *any* viable claims against the Defendants.

Plaintiff's Third Amended Complaint doubles down on his "shotgun" approach by alleging in the most conclusory fashion, this time with more trimmings but not additional substance, that his employment was terminated for a litany of unlawful reasons.  But Plaintiff *still* has not alleged any facts that give rise to a plausible claim for relief under controlling Supreme Court authority, and therefore, his claims should be dismissed.

First, the Court should dismiss Plaintiff's claims under the New Jersey Law Against Discrimination ("LAD") on the basis of color, race, perceived disability, genetic characteristics, gender, and sexual orientation, because he has not alleged facts to establish viable claims for any such discrimination.

Second, the Court should dismiss Plaintiff's LAD hostile work environment claim because Plaintiff does not allege any severe or pervasive conduct that would

not have occurred *but for* a protected category, and erroneously uses this claim to challenge discrete compensation and promotion decisions for which he cannot establish a *prima facie* case of discrimination.

Third, the Court should dismiss Plaintiff's claim for intentional infliction of emotional distress ("IIED") because it is preempted by his statutory employment claims and, in any event, ordinary allegations of employment discrimination do not give rise to such a claim.

Fourth, the Court should dismiss Plaintiff's New Jersey Conscientious Employee Protection Act ("CEPA") claim as barred by CEPA's one-year statute of limitations. Even if this claim were not time-barred, there are no allegations to plausibly allege a causal connection between Plaintiff's "questioning" certain directors about BlackRock policies in 2018 and his termination in 2022 for violating the Vaccination Policy.

Fifth, the Court should dismiss Plaintiff's declaratory judgment claim because the federal statute and regulation that Plaintiff alleges were violated by BlackRock's Vaccination Policy do not create any private right of action, as this Court held earlier this year when Plaintiff's counsel sued in his own name seeking to challenge this Court's COVID-19 protocols on an identical theory.

Finally, the Court should dismiss all claims against individual defendant Laurence Fink, BlackRock's Chairman and CEO, for the additional reason that

Plaintiff does not (and cannot) allege that Mr. Fink did anything to him personally, and so there can be no individual liability.  Given the lack of any action by Mr. Fink, in his individual or official capacity, directed at Plaintiff, his being named as an individual defendant is clearly an effort to grab headlines and harass BlackRock and Mr. Fink.  The CEO of the world's largest asset manager with over $9 trillion under management and 20,000 employees should not be distracted from his mission of serving BlackRock's stakeholders to defend himself in a case challenging an individual's employment decisions for which he was completely uninvolved.

For all of these reasons, Defendants' Motion should be granted, and the Third Amended Complaint should be dismissed in its entirety.

## II.  STATEMENT OF ALLEGED FACTS AND PROCEDURAL HISTORY[1]

### A.  Plaintiff's Employment Ended After He Violated BlackRock Policy.

Plaintiff began working for BlackRock in 2015 as an equity finance trader. Dkt. No. 12, Plaintiff's Third Amended Complaint ("TAC") ¶ 14.  Plaintiff worked at the Company's office in Princeton, New Jersey, and starting March 2020, "worked exclusively from his personal residence in New Jersey."  TAC ¶¶ 34, 38.  In October 2021, BlackRock implemented a "COVID-19 vaccine mandate" requiring

---

[1]  Defendants assume the truth of Plaintiff's allegations solely for purposes of this Motion.

employees to be vaccinated against COVID-19, absent an approved accommodation (the "Vaccination Policy"). TAC ¶¶ 40, 43. Plaintiff requested, but did not receive, such an accommodation. *See* TAC ¶¶ 43-51. Plaintiff continued to refuse to take a COVID-19 vaccine, which resulted in the termination of his employment pursuant to the Vaccination Policy, and his employment ended effective February 1, 2022. TAC ¶¶ 55-56.

Plaintiff alleges that his "open questioning of [Environmental, Social, and Governance ("ESG") impact investing] policies," which he alleges "he reasonably believed that such investment objectives at the very least violated fiduciary responsibilities to investors and public policy, if not law," resulted in a "moment of silence" during a "corporate strategy meeting in or about 2018 with numerous Directors." TAC ¶¶ 25-26. Plaintiff also alleges that it was not "reasonably feasible" for BlackRock to terminate his employment because he was "so successful" in 2019, and "had record profits in 2020." TAC ¶¶ 29, 39. He also alleges that he received an "'Outperform' rating . . . for his work for both 2020 and 2021." TAC ¶ 52.

Plaintiff alleges that in January 2022, he was "given a reduced bonus from the prior year, although, upon information and belief, he had earned a larger bonus." TAC ¶ 52. Plaintiff alleges that his "termination, as well as his reduced compensation and benefits, was based, in whole or in part on" a laundry list of protected characteristics. TAC ¶ 59. Plaintiff simultaneously alleges that the

Company ended his employment based "on its desire to retaliate against Mr. Dzibela for having question[ed] ESG investing and [Diversity, Equity, and Inclusion ("DEI")] policies, and because" he was unvaccinated.  TAC ¶ 46.

### B.    Procedural History

On March 14, 2023, Plaintiff commenced this action by filing a Complaint in the Superior Court of New Jersey, Monmouth County, Law Division.  *See* Dkt. No. 1.  Plaintiff subsequently filed an Amended Complaint on March 15, 2023, and filed the Second Amended Complaint on March 21, 2023.  *See* Dkt. No. 1.  On April 14, 2023, Defendants timely removed this action to the United States District Court for the District of New Jersey.  Dkt. No. 1.

On May 4, 2023, Defendants filed a Motion to Dismiss Plaintiff's Second Amended Complaint.  Dkt. No. 5.  After Plaintiff indicated an intent to amend again, the parties stipulated to Plaintiff's filing of a Third Amended Complaint, reserving all of Defendants' rights in response thereto, and withdrawing the pending Motion to Dismiss Plaintiff's Second Amended Complaint.  *See* Dkt. No. 10.  On June 9, 2023, the Court entered an Order pursuant to the parties' stipulation.  Dkt. No. 11.

## III.    <u>LEGAL STANDARD</u>

The purpose of Rule 12(b)(6) is to streamline litigation by dispensing with baseless claims that will result in needless discovery.  *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).  When "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  To survive a motion to dismiss, plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  A claim is plausible only when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although courts are generally required to accept factual allegations in a complaint as true and draw reasonable inferences in favor of the non-moving party, the Court is not bound by "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," and the Court need not credit a Plaintiff's "legal conclusions." *Id*.  "For example, the court is free to ignore legal conclusions or factually unsupported accusations which merely state that 'the-defendant-unlawfully-harmed-me.'" *Nguyen v. Quick Check, Store No. 129*, 2013 U.S. Dist. LEXIS 176067, at *7 (D.N.J. Dec. 16, 2013) (quoting *Iqbal*, 556 U.S. at 675).

In determining whether a plaintiff has satisfied this standard, courts must first "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.  After disregarding these conclusory allegations and threadbare assertions, a court should then accept as true

only the remaining factual allegations and determine whether those allegations "plausibly give rise to an entitlement to relief."  *Id.*

Plaintiff's Third Amended Complaint should be dismissed because Plaintiff does not allege sufficient facts to plausibly maintain any of his claims.

## IV.   <u>LEGAL ARGUMENT</u>

### A.   **Plaintiff Fails to Factually Support His Claims of Discrimination Based on Color, Race, Perceived Disability, Gender, Sexual Orientation, or Predisposing Genetic Characteristics.**

The factual allegations in Plaintiff's Third Amended Complaint make clear that his employment ended as a consequence of his refusal to comply with the Vaccination Policy, after his request for an exemption was denied.  *See* TAC ¶¶ 47, 51.  Plaintiff does not allege facts sufficient to support any of his claims of unlawful discrimination.  Each of those bases is addressed in turn.

#### 1.   *Race, Color, Gender, and Sexual Orientation Discrimination*

Plaintiff fails to plead facts sufficient to maintain a claim for race, color, gender, or sexual orientation discrimination.

##### a.   *Plaintiff fails to plead a viable claim for discrimination in the termination of his employment.*

Plaintiff does not allege any facts that create a plausible claim for race, color, gender, or sexual orientation discrimination in the termination of Plaintiff's employment for failure to comply with the Vaccination Policy.  TAC ¶ 2.

Plaintiff alleges that "[i]n 2018, at [an] [i]nternal quarterly earnings meeting, [Mr.] Fink, a white male, announced that there were too many white males in leadership positions," although Plaintiff does not allege that he was ever in such a leadership position, or how this alleged comment related to the termination of his employment *four years* later.  TAC ¶ 17.  Plaintiff alleges that thereafter, Mr. Fink "began a campaign whereby employees in BlackRock would be judged on discrete factors such as race, gender, and sexual orientation," although he does not provide any examples to support that claim, nor does he factually allege that he was judged based on such factors or replaced with someone of a different race, color, gender, or sexual orientation.  TAC ¶ 17; *see also* TAC ¶ 62 (alleging only "[u]pon information and belief, multiple individuals ultimately were hired to replace Mr. Dzibela," without specifying their race, color, gender, or sexual orientation, only that they "better fit defendants' discriminatory DEI policy preferences.").

Plaintiff also alleges that in 2018, "management compensation became tied, in part, to hitting 'Diversity, Equity and Inclusion' ('DEI') targets," but again, he does not allege any facts as to how this resulted in any employment action taken against him based on his race, color, gender, or sexual orientation, particularly the termination of his employment for failure to comply with the Vaccination Policy.  TAC ¶ 2.

8

These are precisely the type of boilerplate, conclusory allegations that are insufficient to state a plausible claim for relief. *Sangi v. Warren Hosp.*, 2011 U.S. Dist. LEXIS 117463, at *7 (D.N.J. Oct. 11, 2011) ("Plaintiff appears to believe that pleading [that he received reduced compensation and was terminated] along with an allegation that Plaintiff is in a protected class is sufficient to state [his] claim.  It is not.").  These conclusory statements consist of "allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010); *see also Nguyen*, 2013 U.S. Dist. LEXIS 176067, at *2 (noting that "the court is free to ignore . . . factually unsupported accusations").

A plaintiff's "subjective belief that [a protected category] played a role in these employment decisions . . . is not sufficient to establish an inference of discrimination." *Groeber v. Friedman & Schuman, P.C.*, 555 F. Appx. 133, 135 (3d Cir. 2014) (affirming motion to dismiss discrimination claim where the plaintiff "present[ed] no discriminatory statements by [the employer] or evidence of discriminatory motive to support her allegations."); *Foy v. Wakefern Food Corp.*, 2010 WL 147925, at *4 (D.N.J. Jan. 7, 2010) (dismissing LAD discrimination claims because "[a] mere allegation that an adverse employment action was motivated by [a protected characteristic], without more, is exactly the type of broad conclusory allegation which the Supreme Court has found insufficient" to survive dismissal).

9

Plaintiff has not stated plausible claims for race, color, gender, or sexual orientation discrimination, particularly where he has pled that BlackRock's motivation in enforcing its policy was "because of its desire to force its employees to be injected with a so-called COVID-19 vaccine. . ." TAC ¶ 47. There is no allegation that the Vaccination Policy, on its face or application, was in any way tied to employees' race, color, gender, sexual orientation, or any other protected category. *See* TAC ¶ 41 ("a participant on the call raised concerns to HR in relation to the COVID policy and expressed they would be alienating, segregating, and potentially losing a larger portion of their staff as a result of such policies. The response was brief and direct to the point that they understood the risks they were taking."). The Policy applied to all employees without regard to any of those factors.

### b. *Plaintiff fails to plead a viable claim for discrimination in compensation.*

Plaintiff likewise does not allege any facts that create a plausible claim for race, color, gender, or sexual orientation discrimination in compensation. Plaintiff alleges that Mr. Fink and BlackRock "required management to replace and/or discriminate against protected classes of white male, heterosexual workers based on their race, color, gender, and gender identity such that promotions and financial compensation within BlackRock became widely tied to criteria related to inclusion in 'groups' which were not among such protected classes." TAC ¶ 21.

Yet again, Plaintiff fails to provide any examples to support his conclusory allegations, fails to allege any facts creating a plausible claim that any decision regarding Plaintiff was based on his race, color, gender, or sexual orientation, and does not identify any comparators outside his race, color, gender, or sexual orientation who received higher compensation or promotions.

Plaintiff alleges in conclusory fashion that "[u]pon information and belief, race, gender, sexual orientation and sexual [identity] became factors in BlackRock's bonus compensation schemes in or about 2018" (TAC ¶ 31), but does not plead any facts to support a plausible claim that his compensation was lowered based on any of these factors. Plaintiff alleges that when he was assigned to "the International Equity Desk, to which [he] moved to obtain better compensation opportunities," but he only compares his compensation to BlackRock's CEO, Mr. Fink "and those carrying out his [policy] directives," whom he claims had "record personal compensation." TAC ¶¶ 28-30. Plaintiff then complains that in January 2022, several years after BlackRock supposedly started considering "race, gender, sexual orientation and sexual [identity]" as "factors" in its "bonus compensation schemes" (TAC ¶ 31), he "was given a reduced bonus from the prior year although, on information and belief, he had earned a higher bonus, and despite his having an 'Outperform' rating given to him for his work for both 2020 and 2021." TAC ¶ 52.

Significantly, all allegations regarding compensation, other than the last allegation regarding the bonus he received in January 2022 for the prior year, are untimely under the LAD's two-year statute of limitations.[2]  Moreover, Plaintiff has not alleged any facts that could create a plausible claim for discrimination in compensation based on race, color, gender, sexual orientation, or any other protected characteristic.  The only comparator identify by Plaintiff is BlackRock's CEO, who also is a white male, and who plainly is not similarly situated to Plaintiff.  *See Vega v. City of Brunswick*, 171 Fed. Appx. 930, 935–36 (3d Cir. 2006) (plaintiffs failed to establish race discrimination in starting pay; the appropriate comparator pool was employees of all racial groups in the same position with similar start dates); *Barber v. Univ. of Med. & Dentistry of New Jersey*, 118 F. Appx. 588, 592 (3d Cir. 2004) (affirming dismissal of wage discrimination claim for Black plaintiff who "failed to produce any evidence that he received less compensation than his white counterparts").  As such, Plaintiff has not alleged a viable claim for discrimination in compensation.

---

[2]    *See Taylor v. Lincare, Inc.*, 2016 WL 3849852, at *5 (D.N.J. July 15, 2016) (recognizing that "[a]ny NJLAD claims arising before May 14, 2013, *i.e.* two years prior to the filing of this action, are time barred"); *Sgro v. Bloomberg L.P.*, 331 Fed. Appx. 932, 938 (3d Cir. 2009) (Discrete acts include "failures to promote, and other adverse employment actions," which "do not fall under the continuing violations doctrine and are subject to the NJLAD's two-year statute of limitations.").

   c.   ***Plaintiff fails to plead a viable claim for discrimination in promotion.***

Finally, Plaintiff alleges that he "was being passed over for promotion, often by foreigners from other nations who were in New York on work visas. . . because such hires increased defendants' desired DEI profile, while simultaneously discriminating against white heterosexual men." TAC ¶ 32. Plaintiff does not identify any specific promotional opportunities he was denied, and he does not allege that he was denied any promotion that went to someone of a different race, color, gender, or sexual orientation – only that he was "passed over for [unspecified] promotion, often by foreigners from other nations." TAC ¶ 32. "[F]oreigners from other nations" could be of the same race and color as Plaintiff, so this allegation does not support claims for race, color, gender, or sexual orientation discrimination. *Khalifeh v. Duff & Phelps Corp.*, 2017 WL 1003220, at *4 (D.N.J. Mar. 15, 2017) (failure to promote claim failed where the "Complaint does not identify: any specific promotion or position that Plaintiff sought but was denied based on his membership in a protected class. . . or any other facts describing the circumstances of such discrimination."); *Dickerson v. New Jersey Inst. of Tech.*, 2019 WL 6032378, at *6 (D.N.J. Nov. 14, 2019) (dismissing failure to promote claim where complaint failed to allege facts establishing that the plaintiff sought or was denied a promotion or sufficiently identifying those employees who were promoted over her); *Coefield v. GPU*, 125 F. Appx. 445, 449 (3d Cir. 2005) (failure to promote claim failed where

13

plaintiff failed to identify "any other applicant with similar or lesser qualifications was promoted in his place").

The Court should dismiss the First, Second, Fifth, and Sixth Counts for discrimination based on race, color, gender, and sexual orientation.

## 2.   *Perceived Disability Discrimination*

In his Third Count, Plaintiff makes convoluted and contradictory allegations that Defendants perceived Plaintiff as disabled.  Plaintiff first alleges that Defendants "perceived [Plaintiff] to be suffering with a disability based on his medical status including, without limitation, his status of being uninjected with the so-called COVID-19 vaccine and/or his underlying health conditions which resulted in rejection of his medical exemption and refusal to provide him with an accommodation."  TAC, Third Count, ¶ 2.  Plaintiff continues, "[m]ore specifically, defendants perceived [him] as being disabled due to his COVID-19 vaccination status after demanding to understand [the] health conditions which required his medical exemption, so much so that they would not offer him an accommodation."  TAC, Third Count, ¶ 3.  Plaintiff also alleges that his medical accommodation request was denied due to "ESG policies, which [were] that all employees should be vaccinated in order to meet one of such goals," and that BlackRock "refused such accommodation because of its desire to force its employees to be injected with a so-called COVID-19 vaccine regardless of their medical condition."  TAC ¶¶ 46, 47.

14

With respect to the allegations that BlackRock perceived Plaintiff as disabled because he was unvaccinated, courts faced with identical claims have consistently dismissed such claims under Rule 12(b)(6). *See, e.g. Johnson v. Mount Sinai Hosp. Grp., Inc.*, 2023 WL 2163774, at *6 (E.D.N.Y. Feb. 22, 2023) ("The decision to vaccinate or not to vaccinate is a personal choice, while a disability under the ADA is not something a person chooses."); *Leggo v. M.C. Dean, Inc.*, 2023 WL 1822383, at *4-7 (E.D. Va. Feb. 7, 2023) (dismissing ADA claim of perceived disability due to unvaccinated status; "the allegation that [Defendant] regarded [Plaintiff] as having a disability of being perpetually infected with or susceptible to COVID-19 is implausible. [Defendant's] COVID-19 policy was generally applicable to all employees, and the company's decision to require all employees to attest to their vaccination status does not plausibly reflect a determination or belief that any of its employees are disabled or impaired."); *Jorgenson v. Conduent Transp. Sols., Inc.*, 2023 WL 1472022, at *4 (D. Md. Feb. 2, 2023) (to survive dismissal, "a plaintiff must plausibly allege that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment," but "vaccination status is likewise not an impairment or an impediment to work-related tasks."); *Speaks v. Health Sys. Mgmt., Inc.*, 2022 WL 3448649, at *5 (W.D.N.C. Aug. 17, 2022) ("Refusing to get a vaccine required by an employer is not itself an 'impairment' of any sort" but rather "reflects a personal choice"); *Shklyar v.*

15

*Carboline Co.*, 2022 WL 2867073, at *5 (E.D. Mo. July 21, 2022), *aff'd*, 2023 WL 1487782 (8th Cir. Feb. 3, 2023) (dismissing perceived as disabled claim under the ADA, explaining plaintiff "alleges that, by implementing its COVID-19 policies and requiring that she comply with them, [Defendant] regarded her as having the disability of a contagious disease and as being substantially limited with impaired immune and respiratory systems. This conclusory allegation is simply implausible in light of the general applicability of [Defendant's] COVID-19 policies.").

These cases dismissed claims that an employee was perceived or regarded as disabled based on one or both of the following bases. First, the perceived disability claims failed because the employer could not be considered to have perceived anything about the individual plaintiff merely by its application of a policy applicable to employees generally (as is the case here). Second, the perceived disability claims failed because being unvaccinated is not a disability and, therefore, being perceived as unvaccinated does not amount to being perceived as disabled. Both rationales apply here and support dismissal. BlackRock could not have perceived Plaintiff to be disabled by application of its general Vaccination Policy. Additionally, choosing to not become vaccinated is not a disability under the LAD's

definition of disability and, therefore, being perceived as unvaccinated does not amount to being perceived as disabled.  *See* N.J.S.A. § 10:5-5(q).[3]

Although these cases were decided under federal law, the analysis and the result are the same under New Jersey's Law Against Discrimination.  *Guzman v. M. Teixiera Int'l*, 2023 N.J. Super. LEXIS 61, *9 (App. Div. June 7, 2023) (affirming dismissal of perceived as disabled claim based on employer's alleged perception that employee had COVID-19 because complaint did not allege that employer perceived employee as having a disability as defined under LAD).

Plaintiff does not plead facts alleging any other basis for a disability under the LAD that BlackRock purportedly perceived him as having.  This Court should join the consistent and overwhelming relevant authority and dismiss Plaintiff's Third Count alleging perceived disability discrimination.

### 3. *Predisposing Genetic Characteristics Discrimination*

The Fourth Count, which alleges discrimination based on Plaintiff's "Predisposing Genetic Characteristics related to his vaccination status" (TAC,

---

[3] N.J.S.A. § 10:5-5(q) ("'Disability' means physical or sensory disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, or illness . . . and which shall include . . . any mental, psychological, or developmental disability, including autism spectrum disorders, resulting from anatomical, psychological, physiological, or neurological conditions which prevents the typical exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.").

Fourth Count, ¶ 2), should be dismissed because there are no allegations that BlackRock gathered or made any decisions based on Plaintiff's genetic information.

The LAD prohibits employment discrimination based on "genetic information," which is defined to mean "information about genes, gene products, or inherited characteristics that may derive from an individual or family member." N.J.S.A. §§ 10:5-5(oo), 10:5-12(a).  Being unvaccinated is unrelated to Plaintiff's genetic information, and being terminated for refusing to become vaccinated in accordance with a policy applicable to all employees fails to state a claim that Plaintiff was terminated based on his individual genetic information.  *See McKinley v. Princeton University et al.*, 2023 WL 3168026, at *3 (D.N.J. Apr. 28, 2023) (dismissing GINA claims based on requirement to submit to COVID-19 testing; "Plaintiff fails to allege that Defendant terminated her employment due to her genetic information or that she was classified in a way that deprived her of employment opportunities due to her genetic information.").  Plaintiff's allegation that a COVID-19 vaccination "*may alter* the human genome" is irrelevant.  TAC, Fourth Count, ¶ 3 (emphasis added).  Not only is the allegation that COVID-19 vaccines "may alter the human genome" both indefinite and false, but it is irrelevant because requiring vaccination against COVID-19 simply does not amount to making a decision based on Plaintiff's individual genetic information.  *See id.*  Rather, the applicable authorities consistently hold that COVID-19 vaccination status does *not*

amount to genetic information. *See, e.g., Harden v. Honeywell Int'l, Inc.*, 2023 WL 3310172, at \*4 (N.D. Ga. May 8, 2023) (granting motion to dismiss GINA discrimination claims: "Plaintiff makes the conclusory allegations that the COVID-19 vaccine is 'gene-editing' or 'genetic therapy'. . . These assertions do not show that vaccination for COVID-19 meets the definition of 'genetic information' that is set forth in GINA."); *Anderson v. United Airlines, Inc.*, 577 F. Supp. 3d 1324, 1332 (M.D. Fla. 2021) (Plaintiff "has not shown that it is substantially likely that he will prove that Covid-19 vaccinations and PCR tests constitute genetic discrimination" for purposes of establishing a GINA claim); *Baum v. Dunmire Prop. Mgmt., Inc.*, 2022 WL 889097, at \*7 (D. Colo. Mar. 25, 2022) (dismissing Plaintiff's GINA claim based on disclosure that her father had COVID-19 because "contracting COVID-19 is not a disease caused by a 'genetic disposition.'").

The Court should dismiss the Fourth Count for "Predisposing Genetic Characteristics" discrimination.

**B.    Plaintiff Fails to Allege Any Conduct Creating A Hostile Work Environment Based on Any Protected Class.**

**1.    *Plaintiff's hostile work environment claim fails because it is based solely on discrete employment actions.***

Plaintiff's hostile work environment claim fails because the claim is premised upon discrete acts – job actions that are individually actionable – rather than a series of acts not individually actionable but which can be aggregated into a claim of hostile

work environment. There is a "bright-line distinction between discrete acts, which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)) (holding failure to promote is a discrete act).

Plaintiff's hostile work environment claim alleges that BlackRock "bas[ed] compensation and/or promotion on [Plaintiff] being in one or more[ ] protected classifications." TAC, Seventh Count, ¶ 4. Plaintiff thus alleges "discrete, well-defined employment actions—[including failure to promote and bonus compensation for a specific year]—constitut[ing] discrete, individually-actionable claims" and the Court should not allow him to "lump[] multiple, discrete actions together in a single count in a district court complaint—as plaintiff has done here" for purposes of his hostile work environment claim. *See Miller v. Soc. Sec. Admin.*, 412 F. Supp. 3d 491, 498 (D.N.J. 2019); *Griffin v. Dep't of Hum. Servs.*, 2019 WL 3369783, at *4 (D.N.J. July 26, 2019), *aff'd sub nom.,* 2021 WL 3780078 (3d Cir. Aug. 26, 2021) ("Plaintiff alleges a series of discrete discriminatory employment decisions such as failure to promote, and decisions regarding Plaintiff's compensation" which "do not establish a pattern for purposes of invoking the continuing violation doctrine, nor do they indicate evidence of a hostile work environment").

Consequently, Plaintiff's hostile work environment claim fails because it is premised upon discrete actions, which actions fail to state a claim for discrimination for the reasons set forth above.

### 2. *Plaintiff's hostile work environment claim also fails because he does not plausibly allege that he experienced a hostile work environment because of a protected class.*

Plaintiff alleges that a "hostile work environment was created for white, heterosexual males who did not fit defendants' desired DEI profile." TAC ¶ 31. But, as described further above, he does not allege that he personally experienced any conduct amounting to harassment, let alone that the conduct would not have occurred *but for* "one or more protected classes related to, without limitation, race, color, gender, and disability." TAC, Seventh Count, ¶ 4; *see Jorge v. City of Newark*, 2016 WL 3461771, at *6 (N.J. Super. Ct. App. Div. June 27, 2016) (LAD hostile work environment claims require plaintiff to show each element of a *prima facie* case, that he experienced conduct that "(1) would not have occurred but for [his] protected status; and [] was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment are altered and the working environment is hostile or abusive."). This is fatal to Plaintiff's claim for unlawful harassment.

### 3. *Plaintiff does not allege any conduct that was so severe or pervasive that it altered his work environment.*

To be actionable, Plaintiff must allege conduct "severe or pervasive enough" to make a reasonable person believe that "the conditions of employment are altered and the working environment is hostile or abusive." *Jorge*, 2016 WL 3461771, at *6. "In determining whether an actionable hostile work environment claim exists, [courts] look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 19–20 (2002). "[T]he relevant inquiry is whether the complained-of *conduct* is severe or pervasive, not whether the *effect* on the plaintiff or on the work environment is severe or pervasive." *Incorvati v. Best Buy Co.*, 2010 WL 4807062, at *10 (D.N.J. Nov. 16, 2010) (granting motion to dismiss hostile work environment claim based on plaintiff's allegations that he was ridiculed on "numerous occasions" and received one email mocking him for having a heart attack and his age, because he failed to allege the "type of severe conduct that alters the conditions of one's employment or creates an abusive environment"); *Tourtellotte v. Eli Lilly & Co.*, 636 F. Appx. 831, 847–48 (3d Cir. 2016) (affirming dismissal of hostile work environment claims because "[a]ssessing the larger context does not allow each [Plaintiff] to rely on the evidence [of conduct directed at others] without demonstrating how conduct directed

22

towards others impacted them in satisfaction of their own *prima facie* case."). Plaintiff also fails to allege offending conduct occurring within the LAD's two-year statute of limitations, so his claims are untimely. *See infra*, Section IV.A.1.b at fn. 2.

Plaintiff simply has not met the bar of alleging *any* conduct, let alone severe or pervasive conduct, directed at him that would cause a reasonable person to believe the conditions of employment were altered and the working environment was hostile or abusive. Plaintiff's Seventh Count should be dismissed.

## C. Plaintiff's Claim for Intentional Infliction of Emotional Distress is Legally and Factually Deficient.

### 1. *Plaintiff's IIED claim is duplicative of and preempted by his statutory claims.*

It is well-settled that the LAD "preempts *any* supplemental common law tort action that is based 'on the same factual predicate.'" *Gaines v. United Parcel Serv., Inc.*, 2014 WL 1450113, at *5 (D.N.J. Apr. 14, 2014) (quoting *Metzler v. Am. Transp. Grp., LLC*, 2008 WL 413311, at *4 (D.N.J. Feb. 13, 2008)). Consistent with that principle, this Court has routinely dismissed common law claims based on the same employment-related allegations underlying the plaintiff's LAD claims. *See, e.g.*, *Belfort v. Morgan Properties*, *LLC*, 2018 WL 3201787, at *10 (D.N.J. June 29, 2018) (granting summary judgment on IIED claims based on the same conduct as his harassment claims); *Metzler v. Am. Transp. Grp., L.L.C.*, 2008 WL 413311, at

23

*4 (D.N.J. Feb. 13, 2008) (granting motion to dismiss negligence and IIED claims that were "based on the same operative facts as . . . claims under the [LAD]"); *Mardini v. Viking Freight, Inc.*, 92 F. Supp. 2d 378, 384 (D.N.J. 1999) (granting motion to dismiss plaintiff's common law wrongful discharge claim for failure to allege facts distinct from her LAD claim, rendering wrongful discharge claim duplicative).[4]

Plaintiff's IIED claim, like each of his other claims, challenges his employment termination for failure to comply with the Vaccination Policy and alleges that "[s]uch acts purposely targeted [Plaintiff] for discrimination and with the threat that he would be forced to place his health at risk in order to maintain his job and career." TAC, Eighth Count, ¶ 3. Plaintiff's LAD claims are based on the same factual allegations and preempt his tort claim for IIED. *See* TAC ¶¶ 4-5 (alleging that Plaintiff "raised questions about the propriety of ESG investing, he was ignored, and ultimately [Plaintiff] would lose his job because of his race and his having raised questions regarding ESG, as well as for exercising his medically-necessary decision not to get a COVID-19 vaccine shot" and alleging BlackRock's "relentless push for discriminatory ESG and [DEI] policies. . . ultimately resulted in

---

[4] Likewise, Plaintiff's statutory claim under CEPA also preempts his common law claims. *Young v. Schering Corp.*, 141 N.J. 16, 29 (1995) ("[O]nce a CEPA claim is 'instituted,' any rights or claims for retaliatory discharge based on… State law, whether its origin is the Legislature, the courts, the common law or rules of court; or regulations or decisions based on statutory authority, are all waived.").

[Plaintiff's] termination"); TAC, Third Count, ¶ 2 ("Defendants perceived [Plaintiff] to be suffering with a disability based on his medical status, including. . . being uninjected with the so-called COVID-19 vaccine.").  Because Plaintiff's common law IIED claim is based squarely upon the same facts used to allege his statutory employment discrimination claims, it is preempted by the LAD and should be dismissed as to all Defendants.

## 2.    *Plaintiff alleges no factual support for his IIED claim.*

Plaintiff also has not alleged an actionable IIED claim, which requires him to show that Defendants "(1) engaged in intentional conduct (2) that was extreme and outrageous (3) and was the proximate cause (4) of severe distress suffered by the plaintiff."  *Quarles v. Lowe's Home Centers, Inc.*, 2006 WL 1098050, at *4 (D.N.J. Mar. 31, 2006).

The only *factual* allegations of actions taken towards Plaintiff are routine employment decisions – compensation, promotion, and termination of employment. *See, e.g.,* TAC ¶ 55; TAC, Eighth Count, ¶ 3 ("Such acts purposely targeted Mr. Dzibela for discrimination and with the threat that he would be forced to place his health at risk in order to maintain his job and career without reasonable justification or excuse.").  Even if Plaintiff had plausibly alleged unlawful discrimination, which he has not, these are the types of employment actions that consistently have been found insufficient to maintain an IIED claim.

"To establish extreme and outrageous conduct, a plaintiff must show conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Witherspoon v. Rent–A–Center, Inc.*, 173 F. Supp. 2d 239, 242 (D.N.J. 2001). "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery on an IIED claim." *Cronin v. Booz Allen Hamilton Inc.*, 2022 WL 3357869, at *5 (3d Cir. Aug. 15, 2022) (affirming D.N.J. dismissal of IIED claims); *Bowie v. Costco Wholesale Corp.*, 2017 WL 3168985, at *6 (D.N.J. July 26, 2017) (collecting cases); *King v. Port Auth. of New York and New Jersey*, 909 F. Supp. 938, 943 (D.N.J. 1995) ("[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.") (citation omitted).

Additionally, severe emotional distress must result, meaning "a severe and disabling emotional or mental condition which may be generally recognized and diagnosed by trained professionals. . . The emotional distress must be sufficiently substantial to result in either physical illness or serious psychological sequelae" under an objective standard. *Turner v. Wong*, 363 N.J. Super. 186, 200, 832 A.2d 340, 348 (App. Div. 2003). "Mere allegations of aggravation, embarrassment, an

unspecified number of headaches, and loss of sleep, are insufficient as a matter of law" to establish severe emotional distress.  *Id.*

The Third Amended Complaint fails to factually allege any "extreme or outrageous conduct" or "severe emotional distress."  Instead, Plaintiff's claim is no more than a challenge to the decisions made regarding his employment, and conclusory allegations that he suffered "emotional distress."  *See Smith v. E. Greenwich Twp.*, 519 F. Supp. 2d 493, 513 (D.N.J. 2007), *aff'd*, 344 F. Appx. 740 (3d Cir. 2009), *as amended* (Nov. 3, 2009) (plaintiff failed to show extreme or outrageous conduct where she was subject to an internal investigation, found to have violated company policies, and suspended without pay); *Obendorfer v. Gitano Grp., Inc.*, 838 F. Supp. 950, 955 (D.N.J. 1993) (dismissing IIED claims, even "insults, no matter how out of touch. . . are still nothing more than verbal assaults all too common in today's rude and inconsiderate social and business interactions. A court is ill-equipped to punish lack of respect and consideration for one's fellow's feelings, and therefore New Jersey has prescribed a heavy burden for one alleging intentional infliction of emotional distress."); *Witherspoon*, 173 F. Supp. 2d at 242 ("Courts have routinely held that claims regarding employment decisions fail to state a claim for intentional infliction of emotional distress as a matter of law.") *Turner*, 363 N.J. Super. at 202 (dismissing IIED claims where "plaintiff merely claimed that she felt humiliated and mortified because of []racial insults" as such an "injury is

27

compensable only if it is severe and substantial. . . [and] has a discernible effect on the plaintiff's ability to function normally, either physically or psychologically, on a daily basis."); *Cagno v. Ivery*, 2022 WL 17887231, at *8 (D.N.J. Dec. 23, 2022) (dismissing IIED claims because allegations that "Plaintiff felt humiliation. . . are insufficient as a matter of law to show severe emotional distress"). Plaintiff's IIED claim should be dismissed.

### D.    Plaintiff's CEPA Claim Fails as Untimely and Lacking Causation.

#### 1.    *Plaintiff's CEPA claim is untimely.*

Plaintiff's employment with BlackRock terminated on February 1, 2022. TAC ¶ 55-56. Plaintiff filed a Complaint initiating this action on March 14, 2023. *See* Dkt. No. 1. Plaintiff did not claim that his employment termination was retaliatory for his having "questioned" whether ESG and DEI policies potentially violated law or public policy until he filed his Third Amended Complaint in June 2023. But even assuming *arguendo* that Plaintiff's CEPA claim related back to his original Complaint filed March 14, 2023, the claim is time-barred and must be dismissed. CEPA has a one-year statute of limitations. *See* N.J.S.A. § 34:19-5 ("an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction."). Plaintiff's claim accrued no later than the end of his employment on February 1, 2022, and his time to bring a CEPA claim expired on February 1, 2023, well before he filed even his first Complaint on March

14, 2023.  *See Villalobos v. Fava*, 342 N.J. Super. 38, 50 (App. Div. 2001), *certif. denied*, 170 N.J. 210 (2001) ("An employee's CEPA claim accrues on the date of [his] actual demotion, suspension or termination of employment."); *Robles v. U.S. Env't Universal Servs., Inc.*, 469 F. Appx. 104, 107 (3d Cir. 2012) (affirming dismissal of time-barred claims because "CEPA requires employees to file suit within a year of an adverse employment action").  The Court should dismiss Count Nine as untimely.

### 2. *Plaintiff's termination in 2022 has no connection to his questions about ESG and DEI policies in 2018.*

Plaintiff also cannot state a *prima facie* case under CEPA without showing that his alleged protected activity caused his termination.   "To demonstrate causation, a plaintiff must show that the retaliatory discrimination was more likely than not a determinative factor in the decision. . . [either] through direct evidence of retaliation or circumstantial evidence that justifies an inference of retaliation."  *Choy v. Comcast Cable Commc'ns, LLC*, 629 F. Appx. 362, 365 (3d Cir. 2015).  Plaintiff's CEPA claim fails for the additional reason that he does not plausibly connect the dots between his "open questioning of ESG policies" to certain directors at a meeting in 2018 (TAC ¶¶ 25-27), and his termination in 2022 for failure to comply with the company-wide Vaccination Policy (TAC ¶¶ 40, 55).  *See Griffin v. Metromedia Energy, Inc.*, 2011 WL 12872504, at *3 (D.N.J. Feb. 7, 2011) (dismissing CEPA claims: "Plaintiff cannot satisfy the fourth prong (causal connection) simply by

satisfying the second and third prongs (whistle-blowing activity and adverse employment action) and then stating in a conclusory fashion that the termination was in retaliation for the whistle-blowing activity").

Plaintiff's allegations demonstrate that he cannot form a causal chain from his purported whistleblowing to his termination. First, Plaintiff does not contend that the unnamed directors to whom he raised "questions" about policies in 2018 were also responsible for Vaccination Policy-related decisions in 2022. *See Dominguez v. Costco Wholesale Corp.*, 356 Fed. Appx. 611, 614 (3d Cir. 2009) (CEPA claim failed where plaintiff "point[ed] to no evidence that the decision-makers . . . knew about his [protected activity] when they decided to terminate his employment").

Second, Plaintiff breaks any possible causal connection with his allegations that for *years* after his questioning of ESG and DEI policies in 2018, he had exceptional results and performance ratings. He contends he had outstanding results in 2019 and 2020 so it was not "reasonably feasible. . . to terminate [him]" (TAC ¶¶ 28-29, 39), and that an "'Outperform' rating [was] given to him for his work in both 2020 and 2021" (TAC ¶ 52). In other words – he had great performance outcomes and ratings, and nothing changed for *four years* after ESG and DEI policies were introduced and Plaintiff allegedly "questioned" them. *See Kerrigan v. Otsuka Am. Pharm.*, Inc., 706 F. Appx. 769, 772 (3d Cir. 2017) (affirming dismissal of CEPA claims because the "temporal proximity does not permit an inference of causation. .

30

. [where there was] a gap of six-months to a year between the adverse employment action and the protected activity").

Finally, any causal chain is severed by the intervening events of a worldwide pandemic in early 2020, BlackRock instituting a company-wide Vaccination Policy in October 2021, and Plaintiff failing to comply with that policy. *See Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 444–46 (D. Mass. 2021) (finding plaintiffs likely could not show a causal connection between protected activity and adverse employment action where defendant asserted that "plaintiffs [were] subject to unpaid leave and potential termination not because they requested exemption, but because they were not approved and remain[ed] noncompliant with the Vaccination Policy").

Plaintiff's CEPA claim should be dismissed.

**E.    Plaintiff's NJDJA Claim Fails Because It is Based on Laws for Which There is No Private Right of Action.**

Plaintiff's Tenth Count seeks a declaration pursuant to the New Jersey Declaratory Judgment Act ("NJDJA") that the Vaccination Policy is "illegal pursuant to the Statute and/or the Regulation," that "all employees who purportedly were terminated due to the [Vaccination] Policy were wrongfully terminated," and "that the so-called COVID-19 vaccines are not safe or effective." TAC, p. 29.

Plaintiff alleges that the Vaccination Policy violates 21 U.S.C. § 360bbb,[5] which is part of the Food, Drug, and Cosmetic Act ("FDCA"), and the Food and Drug Administration's ("FDA") informed consent requirement on human research studies, 45 C.F.R. § 46.116 ("informed consent requirement").[6]

Neither FDCA Section 360bbb nor the FDA's informed consent requirement provide for a private right of action.  Plaintiff's counsel knows this because this Court recently dismissed his claims against then-Chief Judge Wolfson and Clerk Walsh challenging this Court's requirement that visitors be vaccinated against COVID-19 or show proof of a negative COVID-19 test to enter the courthouse. Addressing the declaratory judgment claim under the same statute and regulation at issue in this case, this Court[7] held that it is "well settled that the FDCA creates no private right of action" because "Section 337 of the FDCA dictates that all such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." *Berutti v. Wolfson*, 2023 WL 1071624, at *5 (D.N.J. Jan. 27, 2023) (citation omitted); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 193 F.3d 781, 788 (3d Cir. 1999) ("It is well settled, however, that the FDCA

---

[5] Incorrectly cited in Plaintiff's TAC, Tenth Count, ¶ 4, as "21 U.S.C. § 300bbb."
[6] Incorrectly cited in Plaintiff's TAC, Tenth Count, ¶ 5, as "45 C.F.R. § 45.116(b)(8)."

[7] The case was decided by Chief Judge Brann from the Middle District of Pennsylvania, sitting by designation.

creates no private right of action") (citing Second, Third, and Fourth Circuit authority holding the same).

Similarly, the FDA's informed consent requirement does not apply to the Defendants and does not provide a private right of action. *See Elansari v. Univ. of Pa.*, 779 F. Appx. 1006, 1009 (3d Cir. July 17, 2019) (affirming dismissal of claim alleging violation of 45 C.F.R. § 46.116 on grounds that the defendant was not subject to the regulation and "that § 46.116 does not provide a private cause of action."); *Bilinski v. Wills Eye Hosp.*, 2016 WL 6247569, at *2 (E.D. Pa. Oct. 26, 2016), *aff'd in rel. part*, 760 F. Appx. 125 (3d Cir. 2019) ("all claims asserted under the federal regulations regarding the 'Protection of Human Subjects' in research (45 C.F.R. §§ 46.101, 46.115, 46.116 and 46.117) are dismissed because the relevant statute does not provide a private cause of action"); *see also* 45 C.F.R. § 46.101 ("this policy applies to all research involving human subjects conducted, supported, or otherwise subject to regulation by any Federal department or agency that takes appropriate administrative action to make the policy applicable to such research . . . Institutions that are engaged in research described in this paragraph and institutional review boards (IRBs) reviewing research that is subject to this policy must comply with this policy.").

Consequently, Plaintiff cannot obtain declaratory relief based upon the relevant statute and regulation, which provide no private right of action. *Excel*

*Pharmacy Servs., LLC v. Liberty Mut. Ins. Co.*, 825 F. Appx. 65, 70 (3d Cir. 2020) ("[I]t is well settled that parties cannot bring a declaratory judgment action under a statute when there is no private right of action under that statute."); *Berutti*, 2023 WL 1071624, at *5 (dismissing federal Declaratory Judgment Act claims because "the FDCA creates no private right of action"); *Aetna Health Inc. v. Srinivasan*, 2016 WL 3525298, at *3 (N.J. Super. Ct. App. Div. June 29, 2016) (affirming dismissal of NJDJA claim where plaintiff did not have a private right of action under the relevant statute); *Browne v. Nat'l Collegiate Student Loan Tr.*, 2021 WL 6062306, at *4 (D.N.J. Dec. 22, 2021) (dismissing NJDJA claim, noting that the cited statute did not confer a private right of action and so the cause of action seeking a declaratory judgment thereunder failed to state a claim).

Plaintiff's NJDJA claim should be dismissed.

### F. Plaintiff Fails to State Any Claims for Individual Liability.

Plaintiff's claims against Mr. Fink should be dismissed for all the same reasons set forth above. In addition, Mr. Fink should be dismissed from the case entirely because Plaintiff does not – and cannot – allege that Mr. Fink had any involvement in decisions related to Plaintiff's employment. Consequently, each of Plaintiff's claims against Mr. Fink should be dismissed.

Liability under the LAD, if any, falls squarely on the *employer* and Plaintiff does not, and cannot, allege that Mr. Fink employed him. *Hoag v. Brown*, 397 N.J.

Super. 34, 47 (App. Div. 2007) ("[t]he lack of an employment relationship between a plaintiff and a defendant will preclude liability under the LAD").  Under the LAD, "individual liability of a supervisor for acts of discrimination . . . can only arise through the 'aiding and abetting'" theory. *See Cicchetti v. Morris Cty. Sheriff's Off.*, 194 N.J. 563, 594 (2008).  Such liability requires that an individual engage in "active and purposeful conduct," that the individual "must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and "must knowingly and substantially assist the principal violation." *Cicchetti*, 194 N.J. at 594.  Even if Plaintiff had alleged an aiding and abetting theory against Mr. Fink, such claims would fail.

In none of Plaintiff's causes of action asserted under the LAD does he allege any act by Mr. Fink that could remotely suggest that he aided and abetted wrongdoing.  Instead, Plaintiff alleges that the Defendants, including Mr. Fink, affirmatively engaged in wrongful conduct and discrimination.  *See* TAC, First Count, ¶ 2 ("Defendants discriminated against [Plaintiff] by their individual acts and on behalf of [BlackRock]); Second Count, ¶ 2; Third Count, ¶ 2; Fourth Count, ¶ 2; Fifth Count, ¶ 2; Sixth Count, ¶ 2; Seventh Count, ¶ 2.

The only specific allegation regarding Mr. Fink is that in 2018, at an internal meeting, Mr. Fink allegedly said there were too many white males in leadership positions, although Plaintiff does not allege that he was ever in a leadership position,

or how this alleged comment related to the termination of his employment four years later for violating the Vaccination Policy.  TAC ¶ 17.  Otherwise, Plaintiff challenges BlackRock's ESG and DEI policies with conclusory allegations that they were unlawful, including speculation as to Mr. Fink's motive and involvement in policy-setting.  TAC ¶¶ 19-23.  Contrary to Plaintiff's assumptions, DEI policies are not facially unlawful, and are supported by the EEOC, which last week affirmed that "[i]t remains lawful for employers to implement diversity, equity, inclusion, and accessibility programs."  *See* Statement from EEOC Chair Charlotte A. Burrows, June 29, 2023 (available at https://www.eeoc.gov/newsroom/statement-eeoc-chair-charlotte-burrows-supreme-court-ruling-college-affirmative-action#:~:text=It%20remains%20lawful%20for%20employers,equal%20opportunity%20in%20the%20workplace); *see also* U.S. EEOC "Best Practices of Private Sector Employers," Executive Summary) (available at https://www.eeoc.gov/best-practices-private-sector-employers) ("a 'best' practice comports with the requirements of the law, as manifested in the Commission's statutory mandates. . . [and] promotes equal employment opportunity and addresses one or more barriers that adversely affect equal employment opportunity.").[8]  Even taking Plaintiff's factual allegations at face value, after disregarding Plaintiff's bald assertions of illegality or causation, they fail to establish individual liability or involvement by

---

[8]  These sources are attached as Exhibit A.

Mr. Fink in Plaintiff's employment sufficient to withstand dismissal under Rule 12(b)(6). *Cicchetti*, 194 N.J. at 594 (finding that "each [supervisor] undoubtedly had responsibility over the employees and over the workplace, and although there is evidence that they failed to act so as to protect plaintiff or effectively respond to his complaints," these actions or inactions "fall well short of the 'active and purposeful conduct,' *see Tarr*, [181 N.J. at 83], that we have held is required to constitute aiding and abetting for purposes of their individual liability."); *see also Cromwell v. Fichter*, 2023 WL 3734969, at *2 (3d Cir. May 31, 2023) (affirming dismissal of claims against individual defendants where the "amended complaint failed to allege that the [individual defendants] were personally involved in the alleged [violations]" or that the "named defendants were involved in alleged[ violations] that he experienced"); *Covington v. Twp. of Hillside*, 2021 WL 4272880, at *4 (D.N.J. Sept. 20, 2021) (dismissing individual defendant where "there are no allegations of specific conduct, knowledge of [plaintiff's] individual circumstances, or other personal involvement" in the alleged violation, and allegations of individual defendant's "development, promulgation, and implementation of policies, procedures, and standards for the department" did not provide sufficient factual support).  As a result, the First, Second, Third, Fourth, Fifth, Sixth, and Seventh Counts of Plaintiff's Third Amended Complaint alleging claims under the LAD should be dismissed as to Mr. Fink.

Similarly, Plaintiff cannot state an actionable IIED claim against Mr. Fink. There are simply no factual allegations against Mr. Fink that create a plausible claim for "extreme and outrageous conduct." *See Quarles*, 2006 WL 1098050, at *4 (dismissing IIED claims, holding conduct was not extreme and outrageous where supervisor discussed Plaintiff's "violation of store policy and discharged her because of that violation"). Plaintiff's Eighth Count should be dismissed as to Mr. Fink.

Plaintiff's Ninth Count should also be dismissed as to Mr. Fink for lack of individual liability. CEPA "will not impose liability on any [individual] unless the plaintiff proves that the defendant took an adverse employment action against him because of his whistle blowing." *Brennan v. Palmieri*, 2008 WL 5233782, at *6 (D.N.J. Dec. 12, 2008). Plaintiff's TAC falls woefully short because he does not factually allege that he disclosed any purportedly unethical or unlawful activity to Mr. Fink, had any other personal interactions with Mr. Fink, or that Mr. Fink took any adverse employment action against him. *See id.* (dismissing CEPA claims against individual defendants where plaintiff had "not alleged facts to support a CEPA claim against [those] individual defendants"; to sustain CEPA claims against individuals, "Plaintiff's Amended Complaint would need to show, for example, that each defendant took a retaliatory adverse employment action against [plaintiff] that was causally linked with [his] alleged disclosure of [unethical or unlawful] activity."); *McKenna v. Verint Americas Inc.*, 2022 WL 3211422, at *6 (D.N.J. Aug.

9, 2022) (no colorable CEPA claim against individual defendant where plaintiff made conclusory allegations that the individual conspired with others but "Plaintiff has not supported [his] conclusory claims with allegations of any specific measures that [the individual] aided and abetted Plaintiff's termination.").

Finally, Plaintiff's Tenth Count asserting a New Jersey Declaratory Judgment Act claim should be dismissed against Mr. Fink for the same reasons as BlackRock– there is no private right of action under the statute or regulation under which Plaintiff seeks to proceed, for the reasons set forth above.

Because none of the counts in the Third Amended Complaint state a viable cause of action for individual liability against Mr. Fink, who is not even alleged to have had any interactions with Plaintiff and was not a decisionmaker with respect to any employment action taken against Plaintiff, he should be dismissed with prejudice from this action.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court grant its Motion to Dismiss Plaintiff's Third Amended Complaint. Because Plaintiff has already amended the complaint in response to Defendants' first motion, Defendants respectfully request that the Third Amended Complaint be dismissed with prejudice.

39

Dated:  July 7, 2023                    Respectfully submitted,

                                        **MORGAN, LEWIS & BOCKIUS LLP**

                                        */s/ Thomas A. Linthorst*
                                        Thomas A. Linthorst
                                        Needhy Shah
                                        502 Carnegie Center
                                        Princeton, New Jersey 08540-7814
                                        Telephone: (609) 919-6600
                                        Facsimile: (609) 919-6701
                                        thomas.linthorst@morganlewis.com
                                        needhy.shah@morganlewis.com

                                        *Attorneys for Defendants BlackRock, Inc.*
                                        *and Laurence Fink*

# EXHIBIT A

 **U.S. Equal Employment Opportunity Commission**

**Press Release**
06-29-2023

# Statement from EEOC Chair Charlotte A. Burrows on Supreme Court Ruling on College Affirmative Action Programs

The following is a statement from U.S. EEOC Chair Charlotte A. Burrows, in response to today's Supreme Court decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* and *Students for Fair Admissions, Inc. v. University of North Carolina*:

"Today's Supreme Court decision effectively turns away from decades of precedent and will undoubtedly hamper the efforts of some colleges and universities to ensure diverse student bodies. That's a problem for our economy because businesses often rely on colleges and universities to provide a diverse pipeline of talent for recruitment and hiring.  Diversity helps companies attract top talent, sparks innovation, improves employee satisfaction, and enables companies to better serve their customers".

However, the decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* and *Students for Fair Admissions, Inc. v. University of North Carolina* does not address employer efforts to foster diverse and inclusive workforces or to engage the talents of all qualified workers, regardless of their background. It remains lawful for employers to implement diversity, equity, inclusion, and

accessibility programs that seek to ensure workers of all backgrounds are afforded equal opportunity in the workplace.

# EXECUTIVE SUMMARY

## A. Introduction and Procedure

Commissioner Reginald E. Jones was appointed by Chairman Gilbert F. Casellas to head the Task Force to study "best" equal employment opportunity policies, programs, and practices of private sector employers. While the Equal Employment Opportunity Commission (Commission or EEOC) is the enforcement agency responsible for compliance with its statutory mandates, the Commission has an important role in facilitating voluntary compliance through education, training, outreach, and policy guidance. Indeed, the primary goal of the Task Force is to facilitate voluntary compliance in its examination of business policies, programs, and practices that will be useful to employers in structuring systems and policies that are consistent with their business priorities as well as with their equal employment opportunity (EEO) obligations and diversity objectives. The Task Force also has presented employers with the opportunity to showcase those policies, programs, and practices of which they are particularly proud.

Accordingly, the Task Force set out to look at noteworthy business practices by which employers are complying with their EEO obligations and diversity objectives, especially practices thought of as creative or innovative. The Task Force also set out to catalogue its findings in such a way that they will be useful to employers, especially smaller and medium-sized employers that are less likely to employ professional personnel and legal staffs. Additionally, ideas were solicited about how the Commission could better assist entities in developing best policies, programs, and practices. The Task Force thus examined what statutory, regulatory, policy or operational changes by the Commission may better facilitate the development of best policies, programs, and practices.

The Task Force divided its study of policies, programs, and practices into six major groupings:
(1) **recruitment and hiring**; (2) **promotion and career advancement**; (3) **terms and conditions**; (4) **termination and downsizing**; (5) **alternative dispute resolution**; and (6) **other**. The focus of "recruitment and hiring" is on affirmative recruitment programs designed to create a diverse workforce, such as internships, recruitment strategies, and education and training programs used for hiring. The focus of "promotion and career advancement" is on programs that have eliminated barriers to the advancement of women, people from diverse ethnic and racial groups, persons with disabilities, and older workers (those forty or older). Such programs as mentoring, education and training for purposes of promotion, and career enhancement initiatives were considered in this group. The focus of "terms and conditions" is on disability and religious accommodation programs, and on sexual harassment, pay equity, insurance, employee benefits, and work-life and family-friendly policies and practices. The focus of the section on "termination and downsizing" is on such areas as retraining and placement programs for employees displaced by downsizing programs, nondiscriminatory early retirement programs, and insurance. "Alternative dispute resolution" focuses on early resolution of employment discrimination complaints and voluntary and effective alternative dispute resolution programs. The "other" category embraces any other policies, programs, or practices not readily identifiable in the previous five groups or where there was an overlap between or among groups.

Since management commitment and accountability are driving forces behind a company's EEQ policies, programs, and practices, it was decided to devote a part of the discussion in the report to this factor as well, thus creating a seventh grouping of "management commitment and accountability." In terms of commitment, the Task Force looked at what management was saying and doing. In terms of accountability, the Task Force looked at tools such as performance appraisals, compensation incentives, and other evaluation measures to reflect a manager's ability to set high standards and demonstrate progress.

The Task Force also decided to discuss a group of companies that have EEQ programs that are particularly noteworthy from a comprehensive perspective. These companies addressed most, if not all, of the elements delineated above and deserve comprehensive recognition for their programs. The Task Force, in addition, recognized various partnerships, involving companies and the facilitation of employment opportunities with other organizations and/or individuals.

The Task Force developed criteria setting forth what a "best practice" is and does, which will be discussed, _infra_. The best practices selected were generally viewed in terms of those criteria. The Task Force also focused on those submissions that were more detailed in terms of the description of the practice and how it worked, and that persuasively explained why the practice was of a noteworthy nature. Furthermore, the Task Force favored those practices that were presented with supporting data as to their effectiveness.

From the outset, submitting employers recognized that the information the Task Force was seeking went beyond simple compliance with the EEQ laws enforced by the EEQC. When they received the Task Force request to hear about "Best Practices," they knew that this meant more than just complying with the minimum requirements of the law. No, this term inherently focuses on what a company is doing at the level of compliance and beyond.

## B. Limitations

Unfortunately, time and financial resources limited the scope of the group's work. The Task Force, as a whole, did not have the luxury of conducting site visits or validation studies of the submissions. Essentially, work was begun with an exhaustive review of the "best practices" literature. Thereafter, paper examinations were conducted relying on stakeholders' submissions at face value, although follow-up was done, where it was available and felt to be helpful. In sum, the Task Force essentially considered whether the practice complied with the law, whether it would likely promote effective equal employment opportunity strategies, considering the barrier or barriers it was designed to address, and its fairness. Of course, the additional element of demonstrable results was considered where available.

The recognition of best practices in this report is a qualified one. The Task Force believes, however, that if appropriately implemented, considering the factual circumstances surrounding the implementation, the cited practices will be reasonably likely to promote equal employment opportunity. Indeed, the Task Force takes as a given that in each instance the submitter believes the practice has been highly successful in the promotion of equal employment opportunity and/or diversity, and, thus, is deserving of recognition.

The Task Force wishes to stress that a best practice may not be universally replicable on a successful basis regardless of employer or industry. We think, however, that the recognition of the practices in this report can provide some of our stakeholders valuable ideas on what has worked for other stakeholders. Such practices may very well be the basis for replication, although individual tailoring to the requirements of the individual worksite may be necessary.

Moreover, the Task Force notes that citing an employer for a best practice does not mean that employer is necessarily a model equal employment opportunity employer generally. A cited practice involves only a specific area of equal employment opportunity. This is because it is possible, for example, that an employer may have an excellent sexual harassment program and policy, yet that same employer may not have an effective policy on the employment of people with disabilities. A model employer must necessarily do many things, involving a multitude of areas, in a commendable manner. We emphasize, however, that even those employers generally cited for recognition may not be immune from criticism, given the parameters and limitations of the Task Force's study.

In sum, since time and resource constraints made it impossible to validate the accuracy of the submissions, or to assess how they are being implemented, it is important to emphasize that the Commission is not endorsing any particular policy, program, or practice. Rather, the Commission's goal is to identify and disseminate information about practices currently being implemented by employers which are likely to promote voluntary compliance with the laws enforced by EEOC.

## C. What is a "best" practice?

The report begins by identifying what the Task Force considers to be relevant in determining what a "best" practice involves. This was not an easy task. The Task Force recognizes that reasonable persons may differ on the question. Nevertheless, the Task Force concluded that most stakeholders should be able, at least generally, to agree with the framework.

In the view of the Task Force, a "best" practice comports with the requirements of the law, as manifested in the Commission's statutory mandates: Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, the Equal Pay Act of 1963, and the applicable sections of the Civil Rights Act of 1991. A best practice promotes equal employment opportunity and addresses one or more barriers that adversely affect equal employment opportunity. Not only does a best practice present serious commitment from management to EEO objectives, but it also addresses management accountability for equal employment opportunity. Effective communication between management and the intended beneficiaries of the practice, as well as with all other employees, is another consistent best practice trait. A best practice embraces fairness to all employees. Finally, a best practice is implemented conscientiously and shows noteworthy results.

## D. "Best" Practice Findings

The second section of the report identifies the policies, programs, and practices that the Task Force believes reasonably likely to assist the employer community and related employees and employee groups

in facilitating their equal employment opportunity programs. As indicated, the Task Force divided its study of policies, programs, and practices into seven factor groupings:

1. **Recruitment and Hiring**;

2. **Promotion and Career Advancement**;

3. **Terms and Conditions**;

4. **Termination and Downsizing**;

5. **Alternative Dispute Resolution**;

6. **Other**; and

7. **Management Commitment and Accountability**.

The second section begins with those companies found to be comprehensively noteworthy, and then identifies noteworthy companies in each of the seven major groupings, including management commitment and accountability. Finally, the Task Force discusses noteworthy partnership arrangements, or any type of collaborative effort involving employers and another group, to achieve EEO worksite objectives.

Ultimately, the most successful companies have figured out that it makes best economic sense to draw talent and ideas from all segments of the population. Inclusive hiring and promotion practices bring into the organization segments of the workforce that may well provide competitive advantage in the increasingly global economy. Systematic exclusion of these segments denies these resources to the organization and lessens the chances of eventual success. For these companies, pursuing diversity and equal employment opportunity is just as integral a business concept as increasing market share or maximizing profits. In this way, diversity and EEO become not just programs, nor even separate departments, but rather a way of life that is integral to all business activities of the company.

However, the EEOC Best Practices Task Force recognizes that often it is not a simple matter for employers to comply with their obligations under our civil rights and EEO laws. This can be complex legal terrain. The EEOC itself enforces five separate statutes, and employers are subject to a myriad of other federal, state and local statutes, ordinances and regulations that also govern the employment arena. Thus, there is no substitute for strong commitment and hard work in this area.

The third section reviews "best" practice findings from a conceptual perspective. Leading companies responding to the Task Force seem to adopt what we call a "SPLENDID" approach to these issues. The acronym "SPLENDID" stands for a series of actions that conscientious employers can take to address EEO and diversity issues: **STUDY, PLAN, LEAD, ENCOURAGE, NOTICE, DISCUSSION, INCLUSION**, and **DEDICATION.** A further explanation of the concepts behind the letters of the acronym is summarized on the following page:

*THE "SPLENDID" APPROACH*

**STUDY** -- Since one cannot solve problems that one doesn't know exists, know the law, the standards that define one's obligations, and the various barriers to EEQ and diversity. Assistance can be obtained from EEOC, professional consultants, associations or groups, etc.

**PLAN** -- Know one's own circumstances (workforce and demographics - locally, nationally, and globally). Define one's problem(s); propose solutions; and develop strategies for achieving them.

**LEAD** -- Senior, middle, and lower management must champion the cause of diversity as a business imperative, and provide leadership for successful attainment of the vision of a diverse workforce at all levels of management.

**ENCOURAGE** -- Companies should encourage the attainment of diversity by all managers, supervisors, and employees, and structure their business practices and reward systems to reinforce those corporate objectives. Link pay and performance not only for technical competencies, but also for how employees interact, support and respect each other.

**NOTICE** --Take notice of the impact of your practices, after monitoring and assessing company progress. Self-analysis is a key part of this process. Ensure that a corrective strategy does not cause or result in unfairness.

**DISCUSSION** -- Communicate and reinforce the message that diversity is a business asset and a key element of business success in a national and global market.

**INCLUSION** -- Bring everyone into this process, including white males. Help them understand that EEQ initiatives are good for the company and, thus, good for everyone in the company. Include them in the analysis, planning, and implementation.

**DEDICATION** -- Stay persistent in your quest. Long term gains from these practices may cost in the short term. Invest the needed human and capital resources.

The suggestions above are just a small sampling of the characteristics that seem to be common in most of the companies that operate their EEQ compliance procedures above and beyond the minimum basic legal requirements. Additional ideas are set forth in each of the seven "best" practice areas studied. Since these ideas are rather extensive, they are not discussed here.

## E. Statutory, Regulatory, Policy, and Operational Changes

The fourth section considers what Commission statutory, regulatory, and policy changes may be necessary to facilitate best practices. This section also considers what the Commission might do operationally to facilitate best practices.

## 1. Statutory, Regulatory, and Policy Considerations

A Task Force committee was assigned to address Chairman Casellas' request for a review of all statutory, regulatory, and procedural guidance for their impact on the development or implementation of best practices, including, if needed, recommendations for changes. After reviewing the comments received from stakeholders and conducting our own assessment of the statutes the Commission enforces, as well as the substantive and procedural guidance documents issued by the Commission, the Task Force concludes that none of the Commission's current regulations or policy guidance hinder the development or implementation of employer best practices.

In addition, based on the input from external and internal stakeholders, the Task Force concludes that no recommendations to Congress for changes in the statutes enforced by the Commission are warranted at this time. While Congressional action to promote voluntary compliance with EEO laws and/or to facilitate employer adoption of best practices may be possible, the Task Force received no specific comments, suggestions, or recommendations in this area.

Finally, the EEOC has been and continues to be committed to providing guidance to the public about the laws we enforce. That commitment includes obtaining input from internal and external stakeholders about the type and kind of policy guidance we should issue. The Office of Legal Counsel, which is primarily responsible for development of policy for consideration by the Commission, regularly meets with a broad range of external stakeholders, including personnel from other federal agencies, to seek input on policy issues. The development of policy is also driven by the types of issues that are reflected in our charge inventory and litigation docket, and by input from investigators and attorneys in the field. The Task Force believes that the Commission should continue to facilitate accessibility and responsiveness on policy issues, and continue to welcome advice and comment from stakeholders on how it may better serve the public interest.

A summary of the Task Force's recommendations is as follows:

- The Task Force recommends that the Commission place greater emphasis on the development of procedural and substantive guidances.

- The Task Force encourages a comprehensive and speedy review of Volume II of the Compliance Manual with input from external stakeholders in close coordination with the Commission staff.

## 2. Operational Considerations

One of the key factors in implementing best practices is for those affected by EEO laws to be well informed about their rights and responsibilities under those laws. This section of the Best Practices Task Force Report assesses what the Commission can do operationally to facilitate the development and implementation of best equal employment opportunity policies, programs, and practices. A Task Force committee was assigned to address this area.

**a. EEOC Education, Technical Assistance, and Outreach Programs**

This part of the Task Force report begins with the history of the Commission's education, technical assistance, and outreach programs designed to inform stakeholders about the statutes and changes in the law. It illustrates the Commission's longstanding and continuing commitment to education, technical assistance, and outreach. From the nationwide voluntary action program begun by the agency in 1966, to the Office of Technical Assistance, created in 1967 and which grew into a twenty-one person office by 1970, to the 1972 creation of the Office of Voluntary Programs that continued operations through the 1970s, the Commission constantly maintained a dual focus with law enforcement on the one hand, and education, outreach, and technical assistance efforts on the other.

Toward the end of the 1970s, the Commission's primary emphasis was on the reduction of its charge backlog. As a consequence, Commission technical assistance and education programs were de-emphasized, with resources being redirected to law enforcement programs and activities. In 1982, Chairman Clarence Thomas, reaffirming the need for active voluntary assistance to complement EEOC's enforcement efforts, required renewed managerial attention to education and outreach activities. Other such efforts initiated during this time were the Office of Special Projects (established to conduct special analyses and make recommendations of operational changes to increase the agency's effectiveness), the Office of Voluntary Assistance (which was designed to provide education and assistance to small employers, unions and individuals), and the Expanded Presence Program (designed to increase the accessibility of EEOC staff to underserved areas).

With the passage of the Gramm-Rudman Act, the EEOC was required to reevaluate its spending on voluntary assistance and education programs. Early in FY 1986, the agency concluded that it could not fully renew its budget allotments for these programs, and funding was steadily squeezed off thereafter. By 1990, our technical assistance activities were largely confined to participation as invited speakers in workshops, seminars, and conferences sponsored by other groups and organizations.

President George Bush signed the Americans with Disabilities Act on July 26, 1990, and on July 26, 1992, the Commission began enforcing Title I of the ADA. In that two-year period, the Commission developed regulations and policy guidance, developed broad technical assistance programs, developed training programs for EEOC staff, as well as plans for providing training to the disability community and employers. These and subsequent ADA implementation activities were performed by the Office of Legal Counsel.

The current EEOC education, technical assistance, and outreach program consists of Commission activities in three areas: (1) national and local enforcement plans [NEP & LEP] (which pledge the Commission to education, outreach, and voluntary resolution as tools to eliminate workplace discrimination); (2) the revolving fund (which produces the agency's fee-paid technical assistance program seminars [TAPS] across the country); and (3) participation of headquarters and field office personnel in thousands of nationwide conferences, meetings, and seminars annually.

**b. Recommendations**

In its discussions with field office staffs and external stakeholders, the Task Force received many comments and suggestions about what EEOC can do to improve both its fee paid and no-fee education and technical assistance programs in advancing the development of best practices, and the role of agency enforcement activities and general operations in helping employers develop best practices. All of these comments and suggestions were considered by the Task Force and many of them have merit. However, in times when Commission resources are limited and demands placed upon those resources are heavy, policy choices placing new stress on those resources are difficult to make. Thus, suggestions entailing large new cost outlays were generally not adopted. Moreover, some of the comments did not appear to be relevant to Task Force issues, or bore significant implications beyond the scope of this report. The Task Force has sought to address the concerns of all stakeholders, and these concerns played a key role in the formulation of its recommendations.

The Task Force's recommendations fall into four primary areas. First, the Task Force recommends that the Commission be more involved in providing employers assistance in implementing best practices. This includes providing technical assistance on-site, where possible, collecting best practices information and models, establishing industry liaison groups, providing more materials, and providing easier and more frequent access to Commission programs. Second, the Task Force recommends that the Commission engage in various communications initiatives. This includes encouraging employers to give their evaluations of Commission activities in education, technical assistance, and outreach, so that the Commission can be even more responsive to employer needs. Third, the Task Force recommends certain coordination initiatives in order to facilitate greater effectiveness and efficiency in the planning and delivery of the Commission's programs. Fourth, the Task Force has made recommendations concerning the use of its settlement agreements and/or consent decrees. A summary of the Task Force's recommendations is as follows:

- Commissioner-led outreach activities across the country should continue, with particular emphasis in areas which historically have been underserved by EEOC.

- Technical assistance should be provided on-site.

- Collect best practices information and models on an ongoing or periodic basis, and provide such information in TAPS presentations and other Commission programs.

- Office of Research, Information and Planning should provide research support and general industry or sector employment and best practices analyses in support of the field offices' NEP/LEP outreach, education, and technical assistance.

- Establish industry liaison groups, to the extent possible, within each district office jurisdiction.

- Revolving Fund Division, Office of Field Programs (OFP), should continue to explore alternative ways to effectively reach nonprofit organizations and small businesses in low cost and more affordable venues and formats.

- Consider holding public hearings, to the extent possible, around the country and/or consider holding a few Commission meetings outside of Washington, DC.

- Continue to encourage open communications with employers who need help from EEOC in changing their current policies and practices.

- OFP should report annually on the status and accomplishments of the Revolving Fund and other education, technical assistance, and outreach

  programs. The report should include an evaluation and presentation of best practices.

- TAPS attendees should be asked how and to what extent the program facilitated their compliance with the law and if so, whether it facilitated best practices.

- To the extent possible, additional resources should be devoted to the agency's no-fee education, technical assistance, and outreach programs.

- OFP and Office of General Counsel should compile and catalogue best practice settlement agreements and/or consent decrees.

* * * * * * * * * * * * *

This report should be thought of, not as a blueprint, but more as an idea bank that can be drawn upon broadly by one and all. The Task Force report's findings and recommendations are not meant to require employers to adopt certain practices or policies to comply with any of the laws enforced by EEOC.