## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KURT DZIBELA,

                      Plaintiff,

v.

BLACKROCK INC., LAWRENCE FINK, and JOHN
DOES 1-23, ABC Company 1-5,

                      Defendants.

Case No. 3:23-cv-02093-PGS-JBD

---

## BRIEF IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS

---

**MURRAY-NOLAN BERUTTI LLC**
136 Central Avenue, 2nd Floor
Clark, New Jersey 07066
Phone: 908-588-2111
ron@murray-nolanberutti.com
Attorney for Plaintiff Kurt Dzibela

On the Brief:
Ronald A. Berutti – N.J. Atty ID No. 023361992

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES...................................................................... ii

STATEMENT OF CASE ........................................................................ 1

STATEMENT OF FACTS........................................................................ 2

LEGAL STANDARD ........................................................................... 13

THE PLAINTIFFS SATISFY PLAUSIBILITY STANDARD SUCH THAT
THE MOTION TO DISMISS MUST BE DENIED.............................................. 13

LEGAL ARGUMENT ........................................................................... 15

POINT I: MR. DZIBELA STATES PLAUSIBLE CLAIMS UNDER THE NEW
JERSEY LAW AGAINST DISCRIMINATION, WHICH MUST BE
LIBERALLY CONSTRUED IN HIS FAVOR ...................................................... 15

A. RACE/COLOR/GENDER/SEXUAL ORIENTATION (COUNTS 1, 2, 5 &
6)……............................................................................................17

B. DISABILITY/PERCEIVED DISABILITY (COUNT 3)................................... 22

C. HOSTILE WORK ENVIRONMENT (COUNT 7) ........................................... 24

D. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT 8)... 26

E. FINK IS PROPERLY NAMED AS A DEFENDANT ....................................... 28

CONCLUSION ................................................................................. 31

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Aguas v. State*, 220 N.J. 494, 528-29 (2015)…………………………………..29

*Alexander v. Seton Hall University*, 204 N.J. 219, 229 (2012)

………………………………………………………………….21

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)…………………………………...14

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)……………………………14

*Catalane v. Gilian Instrument Corp.*, 271 N.J. Super. 476, 492 (App. Div. 1994)

……………………………………………………………….27

*Cicchetti v. Morris County Sheriff's Office,* 194 N.J. 563, 594 (2008)

……………………………………………………………….30

*Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 597 (1988)……………………….17

*Exby-Stolley v. Bd. of Cnty. Comm'rs,* 979 F.3d 784, 792 (10th Cir 2020)…………..24

*Fuchilla v. Layman,* 109 N.J. 319, 335 (1988)……………………………….16

*Groff v. DeJoy*, 143 S. Ct. 2279, 2294 (2023)……………………………… 22

ii

*Joblove v. Barr Labs., Inc. (In re Tamoxifen Citrate Antitrust Litig.)*, 429 F.3d 370, 384

(2nd Cir. 2005)…………………………………………………………………………...14

*Lehmann*, 132 N.J. at 619-20 (same)……………………………………………………....29

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)……………………………...17

*Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)……………...14

*Raspa v. Office of Sheriff of County of Gloucester,* 191 N.J. 323, 335 (2007)……16

*Richter v. Oakland Bd. of Educ.*, 246 N.J. 507, 537 (2010)………………………….16

*Richter v. Oakland Bd. of Educ.*, 246 N.J. 507, 529-530 (2021)……………………...24

*Rios v. Meda Pharm., Inc.*, 247 N.J. 1, 10 (2021)…………………………….16, 25, 29

*Rodriguez v. Raymours Furniture Co., Inc.*, 225 N.J. 343, 347 (2016)……………16

*Smith v. Millville Rescue Squad*, 225 N.J. 373, 390 (2021)………………………...16

*Soliman v. Kushner Companies, Inc.*, 433 N.J. Super. 153, 177 (2013)…………...27

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct.

2141, 2161(2023)………………………………………………………………………...17

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)

…………………………………………………………………………………………14

**Statutes**

*N.J.S.A.* 10:5-1……………………………………………………………15

*N.J.S.A.* 10:5-12…………………………………………………………...15

*N.J.S.A.* 34:19-1…………………………………………………………...26

## STATEMENT OF CASE

The plaintiff, Kurt Dzibela ("Mr. Dzibela") was confronted with a choice with defendants' COVID-19 shot mandate: 'risk your life or keep your job.' Defendants knew the answer in advance. Their unidentified committee had decided that Mr. Dzibela, a white male who had dared question the policies of Chairman Larry Fink, one of the world's most powerful people, was going to choose his life. The fact that Mr. Dzibela was already working from home with great success was irrelevant. What truly was relevant was that Mr. Dzibela did not fit defendants' DEI profile, and that Mr. Dzibela pushed back on Fink's grand scheme to change the world to fit his desired political and social goals. Defendants knew or should have known that their policies were illegal; yet because of their massive influence over virtually all major corporations and many governments, defendants believed that they would force change in worldwide policy. Mr. Dzibela was a victim of that change and it did not matter that he had a medical exemption for the vaccine--a vaccine for which BlackRock was making billions of dollars.

Defendants wish to pick apart Mr. Dzibela's Complaint and to kill it with a thousand cuts before there is an opportunity for Mr. Dzibela to further explore the facts which will demonstrate the truth of his allegations. That said, the Third Amended Complaint[1] provides ample allegations to defeat the Motion to Dismiss,

---

[1] This action originally was filed in the Superior Court of New Jersey. It subsequently was removed to the District Court by defendants. The First and Second

1

as the intertwined facts as alleged demonstrate that Mr. Dzibela's claims are plausible and that he thus is entitled to pursue both named defendants.

## STATEMENT OF FACTS

Mr. Dzibela was a model employee of defendant BlackRock, Inc. ("BlackRock"). He was recruited in 2015 to join defendant as a Senior Trader and succeeded in helping to accelerate client asset growth, thus making his work profitable both for BlackRock and its clients. (TAC ¶1)[2] In or around 2018, BlackRock began to shift its focus away from seeking traditional yields for its clients, and instead began placing much more emphasis on "Environmental, Government, and Social" ("ESG") impact investing which was not necessarily in clients' best financial interests, and management compensation became tied, in part, to hitting "Diversity, Equity and Inclusion" ("DEI") targets. (TAC ¶2) Further, at about that time, BlackRock, began accelerating gender and race-based promotions,

---

Amendments were non-substantive revisions which were filed in state court related to clerical errors. The only substantive amendments have been in the Third Amended Complaint, which was filed in the District Court. Since filing the Third Amended Complaint, the plaintiff has discovered statements by Fink and policy papers which amply demonstrate that bonuses were tied to race and other DEI factors, and that Fink was engaged in an effort to "force" its ESG policies both within BlackRock and in other corporations which BlackRock essentially controlled. Should this Court find allegations herein to be insufficient in such regard, it is requested that leave be granted to file a Fourth Amended Complaint which lays out, in Fink's own words, his plan for BlackRock and the world.

[2] "TAC" is the Third Amended Complaint; "Db" is defendants' brief in support of their Motion to Dismiss.

and de-emphasized compensation for traders based on financial achievements for clients, but more on the discriminatory factors and factors associated with ESG investing. (TAC ¶3) When Mr. Dzibela raised questions about the propriety of ESG investing, he was ignored, and ultimately Mr. Dzibela would lose his job because of his race and having raised questions regarding ESG, as well as for exercising his medically-necessary decision not to get a COVID-19 vaccine shot, which was required of him, although he was working from home most of the time and could have been reasonably accommodated with full time work at home. (TAC ¶4)

All of such actions were the direct and proximate result of BlackRock founder, Chairman, and CEO Lawrence Fink's ("Fink") relentless push for discriminatory ESG and related Diversity, Equity & Inclusion ("DEI") policies which created a hostile work environment and ultimately resulted in Mr. Dzibela's termination.

Mr. Dzibela began working for defendant BlackRock in 2015 as an equity finance trader on the International Equity Desk after having been recruited to join the firm. (TAC ¶14) Mr. Dzibela, who was always an excellent employee, and is a heterosexual white male who has previously experienced medical problems associated with being vaccinated. (TAC ¶15-16)

In 2018, at internal quarterly earnings meeting, Fink, a white male, announced that there were too many white males in leadership positions, and began a campaign whereby employees in BlackRock would be judged based on discrete factors such as race, gender, and sexual orientation for DEI purposes, which violated statues and

laws of the United States and New Jersey. (TAC ¶17) Also, in or around 2018, BlackRock began shifting investment priorities for its customers, to whom it owed a fiduciary duty to generate the highest returns, by shifting institutional investment recommendations into "Environmental, Social, and Government" ("ESG") vehicles from higher yielding and better performing investments, in violation of law and public policy. (TAC ¶18) Fink's goal and his promotion of illegal and inappropriate DEI and ESG policies by using BlackRock's investment capital to "train" corporations as to what Fink, personally, views as "acceptable behavior," which in turn would steer public policy in a new direction toward a model where discrimination against 'non-marginalized groups' such as white, heterosexual males, including Mr. Dzibela, would be viewed as being 'acceptable.'(TAC ¶19) However, such discriminatory behavior and corporate practices encouraged by Fink were and remain illegal, and all discrimination against Mr. Dzibela was the direct and proximate result of Fink's promotion of illegal DEI and ESG policies which were discriminatory against protected classes related to, without limitation, race, gender, and disability. (TAC ¶20)

In keeping with Fink's desire to promote such discriminatory practices, Fink, individually and on behalf of defendant BlackRock, began a campaign which explicitly or implicitly required management to replace and/or discriminate against protected classes of white male, heterosexual workers based on their race, color, gender, and gender identity, such that promotions and financial compensation within

4

BlackRock became widely tied to criteria related to inclusion in 'groups' which were not among such protected classes. (TAC¶ 21) Fink set policies which promoted and expressly or implicitly mandated elimination of employees who were white, male and heterosexual and/or discrimination against them in their compensation as part of a campaign surrounding corporate governance at BlackRock, and generally among publicly-traded corporations over which BlackRock held sway based on its multiple trillion dollars of investment capital, as reflected in annual letters published by Fink which were openly designed to steer corporate policies not only of BlackRock, but of those corporations in which BlackRock invested its investment capital. (TAC ¶22) BlackRock's influence was so great, given the vast amount of investment capital it had, that failure to follow Fink's essential command of such illegal policies could result in destruction of share value and loss of executives' seats on Boards of Directors and in executive management, and its push within BlackRock was essentially a model by which Fink sought to influence other publicly traded companies to behave in hiring and compensation, although such practices wholly violate law and public policy. (TAC ¶ 23)

On several occasions, Mr. Dzibela openly questioned management about the propriety of BlackRock's DEI policies and about how BlackRock traders were supposed to sell ESG vehicles to customers when it owed the customers fiduciary duties to generate the highest returns and/or otherwise to act in the clients' best interests and not in the parochial political and social interests of the corporate CEO

and Chairman, such that recommending ESG investments was not in keeping with BlackRock's fiduciary duties to its clients and violated public policy, and may have violated law. (TAC ¶24) Such questions were raised by Mr. Dzibela on several occasions, including in one corporate strategy meeting in or about 2018 with numerous Directors who discussed the manner in which the corporate agenda was going to be steered to carrying out Fink's policies and in the direction of ESG investing and DEI hiring, which is a component of ESG. (TAC ¶25) Mr. Dzibela's open questioning of ESG policies was made because he reasonably believed that such investment objectives at the very least violated fiduciary responsibilities to investors and public policy, if not law. (TAC ¶26) When Mr. Dzibela raised the question an awkward "mic drop" moment of silence occurred because of the obvious correctness of the question which the Directors could not address in light of the policies being implemented because of Fink's open command that such policies be executed by management. (TAC ¶27)

Despite such policies, the International Equity Desk, to which Mr. Dzibela moved in order to obtain better compensation opportunities, had a record year in 2019 and was up approximately 500% from 2015 when Mr. Dzibela started, all during a period where markets, generally, were generating record-breaking returns. (TAC ¶28) Because Mr. Dzibela was so successful, it was not reasonably feasible at such time to terminate Mr. Dzibela. (TAC ¶29) Despite the same, Mr. Dzibela's compensation was flat while, upon information and belief, Fink and those carrying

out his directives regarding ESG investments and race-based hiring policies had record personal compensation. (TAC ¶30)

Race, gender, sexual orientation and sexual identity became factors in BlackRock's bonus compensation schemes in or about 2018, to Mr. Dzibela's detriment, as a result of Fink's policies that had to be carried out within the corporation.[3] Combined with the outspoken discriminatory intent of Fink and his subordinates who were executing his policies, a hostile work environment was created for white, heterosexual males who did not fit defendants' desired DEI profile. (TAC ¶31) Moreover, Mr. Dzibela was being passed over for promotion, often by foreigners from other nations who were in New York on work visas in whole or in part because such hires increased defendants' desired DEI profile, while simultaneously discriminating against white, heterosexual men. (TAC ¶32) As a result, Mr. Dzibela noted to management that he obviously was not fitting the 'criteria' for advancement, implying that he was not of the 'right' race, sex, and sexual orientation. (TAC ¶33)

---

[3] See Footnote 1, above, regarding newly discovered video of Fink admitting to these things and how DEI and ESG would factor into employee compensation pursuant to his personal policies. https://youtu.be/-cCs9Kh2Q08 at 27:45. Moreover, Fink has recently acknowledged problems with BlackRock's ESG policies and only now is openly asserting that BlackRock no longer advancing an ESG agenda (https://finance.yahoo.com/news/larry-fink-isnt-saying-esg-but-he-is-urging-investors-to-stay-focused-on-climate-154729707.html), which are issues that Mr. Dzibela was adversely affected by at all relevant times. Thus, should the Court believe that such facts are inadequately pled, it is requested that leave be granted to re-plead.

In or about 2019, Mr. Dzibela was provided with a flexible work schedule whereby he worked out of defendant's Princeton, New Jersey office. (TAC ¶9, 34) Then in 2020, Mr. Dzibela was moved to the US Equity desk to assist, as the US Equity desk had a lack of experienced traders who could lead and trade the book effectively. (TAC ¶34) Mr. Dzibela started working for the US Equity desk prior to the general outbreak of the COVID-19 pandemic. (TAC ¶35) Later in the year, the move to the US Equity Desk was made official within the organization. (TAC ¶35) When the pandemic struck in or around March 2020, Mr. Dzibela worked exclusively from his personal residence in New Jersey and ultimately was not allowed to work in New York, such that his place of work was strictly in New Jersey, which caused no undue hardship on BlackRock. (TAC ¶38) With Mr. Dzibela at the US Equity desk, it had record profits in 2020 despite the pandemic, such that terminating him still was not reasonably feasible and would have been highly irresponsible. (TAC ¶39)

BlackRock was not known for investing in small start-up companies. (TAC ¶36) However, in or around mid-2019, BlackRock purchased some 10,000,000 shares of a new pharmaceutical company that was little known, called Moderna. (TAC ¶36) Defendant's official holdings of Moderna stock went from 568,431 shares reported in Q1 2019 to 11,740,448 shares by Q4 2019, when the first reported case of COVID-19 was on or about January 20, 2020. (TAC ¶36) Months later, Moderna became a household name as it developed a purported vaccine that received

8

Emergency Use Authority from the U.S. Food and Drug Administration, thus accelerating its share value. (TAC ¶37) Indeed, the COVID-19 shots are not actually vaccines at all in the traditional sense, and they are not capable of giving a person immunity from the SARS-2 virus. (TAC Count 10, ¶48) Instead, those receiving such purported vaccines will continually have to get booster shots to keep up with the ever-changing SARS-2 virus, while the unvaccinated will likely develop natural immunity, which multiple studies show to be superior to vaccine 'immunity'. (TAC Count 10, ¶ 48)

In or about October 2021, defendant BlackRock instituted a so-called COVID-19 vaccine mandate, which was a conflict of interest for the corporation in light of its heavy investment in Moderna. (TAC ¶40) Mr. Dzibela also learned at a personnel manager Director's meeting, a participant on the call raised concerns to HR in relation to the COVID policy and expressed they would be alienating, segregating, and potentially losing a larger portion of their staff as a result of such policies. (TAC ¶41) The response was brief and direct to the point that they understood the risks they were taking. (TAC ¶41) Upon information and belief, defendants were hoping to lose employees so that they could accelerate the process of engaging in discriminatory hiring practices centered on DEI. (TAC ¶42) The subject policy was never intended to provide medical protection for people, but rather, was an effort by defendants to enrich themselves due to their investment in Moderna in particular, and other vaccine manufacturers generally. (TAC, Count 10

9

at ¶ 50)[4]

Mr. Dzibela had a pre-existing medical condition that made him a candidate for a medical exemption, however, in seeking an exemption Mr. Dzibela would have to reveal his private medical condition to BlackRock, despite BlackRock have no legal right to receipt of such information. (TAC ¶43) In or about December 2021, Mr. Dzibela provided defendant BlackRock with a Medical Exemption letter form provided by his Medical Doctor who advised against the so-called vaccine for Mr. Dzibela due to his medical condition, which condition was expressed in the letter. (TAC ¶44) Defendant BlackRock denied the medical exemption and offered Mr. Dzibela no accommodation because Mr. Dzibela had a medical condition which precluded him from being vaccinated, although Mr. Dzibela was working exclusively from home at that point. (TAC ¶45) Upon information and belief, BlackRock's denial of the medical exemption was based, in whole or in part, on its desire to retaliate against Mr. Dzibela for having questions ESG investing and DEI policies, and because by refusing the vaccine--although for his health--Mr. Dzibela did not meet a new feature of Fink's ESG policies, which was that all employees

---

[4] As owners of millions of shares in the pharmaceutical companies that manufactured the COVID-19 vaccines, and with their unprecedented research capabilities, defendants can be presumed to have known of the studies, published in the *New England Journal of Medicine,* regarding the unquestionable facts regarding the ineffectiveness of all three vaccines at their outset, all of which had under a 2% Absolute Risk Reduction under optimal, pre-variant circumstances. (TAC, Count 10, ¶¶13-42)

should be vaccinated in order to meet one of such goals, which goals simultaneously enriched BlackRock due to its investments in Moderna and other vaccine manufacturers. (TAC ¶46)

Defendant BlackRock could have continued providing Mr. Dzibela the reasonable accommodation of working from home, but refused such accommodation because of its desire to force its employees to be injected with a so-called COVID-19 vaccine regardless of their medical condition. (TAC ¶47) Further, defendants desired to replace Mr. Dzibela with a person who was not a white male, and who did not question defendants' ESG investing, and wished to use the so-called vaccine mandate as a pretext to terminate Mr. Dzibela for such reason. (TAC ¶48)

Thereafter, Mr. Dzibela, at the direction of defendant BlackRock, resubmitted his medical exemption letter, which BlackRock advised would be re-evaluated by an outside consultant or consultants, including but not limited to ABC Company 1-5, who utilized some or all of John Does 1-25 for such purposes. (TAC ¶49) Defendant BlackRock refused to identify the name(s) of the consulting entity or the person or people who were reviewing Mr. Dzibela's medical records and/or medical exemption letters. (TAC ¶50) On January 12, 2022, Mr. Dzibela was advised that his medical exemption was denied. (TAC ¶51) No reason was given, but it was implied that Mr. Dzibela's medical condition was a discriminating factor in denying the exemption since it was not 'serious enough' to merit defendants' concern and, thus, was used as a factor in the ultimate decision to terminate Mr. Dzibela for not

11

receiving a COVID-19 vaccine. (TAC ¶51)

On January 15, 2022, Mr. Dzibela was given a reduced bonus from the prior year although, upon information and belief, he had earned a larger bonus, and despite his having an "Outperform" rating given to him for his work for both 2020 and 2021, thus furthering the hostile work environment with which he was faced. (TAC ¶52) Upon information and belief, the reduced bonus was provided to Mr. Dzibela because of his race, color, medical status, perceived disability, gender, sexual orientation, actual or perceived disability and/or discrete genetic characteristics. (TAC ¶53; see footnote 1)

On January 13, 2022, the United States Supreme Court ruled against the continued imposition of certain so-called COVID-19 vaccine mandates. (TAC ¶54) Shortly after such decision was handed down, Mr. Dzibela was advised that he was being terminated effective February 1, 2022, due to his refusal to become injected with the so-called COVID-19 vaccine because of his medical condition for which defendants refused a reasonable accommodation that already was in place, and which had not adversely affected Mr. Dzibela's performance. (TAC ¶55) Defendant BlackRock now claims that Mr. Dzibela "resigned" by choosing not to be vaccinated, which is false since Mr. Dzibela had no intention of leaving BlackRock and instead was forced out of his employment. (TAC ¶56) No reasonable accommodation was offered to Mr. Dzibela, despite his previously having worked from home, where his vaccine status was irrelevant, without incident. (TAC ¶57)

12

Defendant BlackRock knew that Mr. Dzibela had minor twin boys with disabilities, which was one of the reasons that he was provided a flexible work schedule from home and was depending on his insurance coverage through his employment to reduce the healthcare costs associated with their upbringing. (TAC ¶58)

After being terminated, in a conversation with one of his former supervisors with intimate knowledge of the process, Mr. Dzibela was told that BlackRock is now using outside consulting firms to filter candidates and wanted to hire people based on their race, color, gender, vaccine status, sexual orientation and the like, in keeping with Fink's DEI hiring command, and that the candidates were less qualified or unqualified because they did not have the knowledge and experience of Mr. Dzibela, yet were hired in some instances only because they fit the DEI profile. (TAC ¶61) Upon information and belief, multiple individuals ultimately were hired to replace Mr. Dzibela, none of whom had Mr. Dzibela's qualifications or experience, but which individuals better fit defendants' discriminatory DEI policy preferences. (TAC ¶62) By reason of the foregoing, Mr. Dzibela has suffered financial, psychological, and physical damage. (TAC ¶63)

## LEGAL STANDARD

## THE PLAINTIFFS SATISFY PLAUSIBILITY STANDARD SUCH THAT THE MOTION TO DISMISS MUST BE DENIED.

In evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), the District Court must accept the plaintiff's well-pleaded allegations as

true and draw all reasonable inferences in his favor. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 234 (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts sufficient to "nudge her claims across the line from conceivable to plausible." *Phillips*, *supra*, 515 F. 3d at 234 (*quoting Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"Given the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." (*quoting Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, (2002).

Here, the plaintiff has alleged claims that, if proved, would satisfy the plausibility standard. Defendants wish this Court to ignore the pleading itself and not to give credence to the facts in a light most favorable to the plaintiff. Mr. Dzibela

14

alleges that a confluence of events related to his questioning ESG investing, defendants' DEI policies, and the vaccine mandate which was based, at least in part, on defendants' profit motive, resulted in his termination. Defendants would have this Court look only at the vaccine mandate. Regardless, facts have been pled which raise significant doubt as to the propriety of terminating Mr. Dzibela due to the vaccine mandate alone, given that he was a remote worker whose treating medical doctor provided Mr. Dzibela with a medical exemption letter. Examining the facts in a light most favorable to Mr. Dzibela, and drawing all reasonable inferences favorably to him, the motion must be denied.

**LEGAL ARGUMENT**

**POINT I**

**MR. DZIBELA STATES PLAUSIBLE CLAIMS, WHICH MUST BE LIBERALLY CONSTRUED IN HIS FAVOR.**

The first seven Counts of the TAC allege violations of the New Jersey Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5-1 *et seq.* The LAD is to be broadly construed in a plaintiff's favor. Mr. Dzibela has satisfied the statutory requirements for making out such claims.

*N.J.S.A.* 10:5-12 reads, in pertinent part (emphasis added):

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

a.     For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic

15

information, pregnancy or breastfeeding, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment…

***

d.    For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act …

"The LAD is remedial legislation that should be liberally construed to advance its purposes." *Rios v. Meda Pharm., Inc.*, 247 N.J. 1, 10 (2021). "The LAD's worthy purpose is no less than eradication of 'the cancer of discrimination' in our society.'" *Smith v. Millville Rescue Squad*, 225 N.J. 373, 390 (2021)(*quoting Richter v. Oakland Bd. of Educ.*, 246 N.J. 507, 537 (2010)). Analysis must start from that premise because "[e]mployment discrimination is not just a matter between employer and employee. The public interest in a discrimination-free work place infuses the inquiry." *Raspa v. Office of Sheriff of County of Gloucester,* 191 N.J. 323, 335 (2007) (*quoting Fuchilla v. Layman,* 109 N.J. 319, 335 (1988)). "One searches in vain to find another New Jersey enactment having an equivalently powerful legislative statement of purpose, along with operative provisions that arm individuals and entities with formidable tools to combat discrimination not only through their use but also by the threat of their use." *Rodriguez v. Raymours Furniture Co., Inc.*, 225 N.J. 343, 347 (2016)

16

In *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2161(2023), the United States Supreme Court made very clear that "[e]liminating racial discrimination means eliminating all of it." Although *Students for Fair Admissions* concerned federal programing and was decided under the equal protection clause, there is virtually no reason to believe that the Court's elimination of affirmative action in university admissions is not a precursor to much more sweeping elimination of all racial discrimination within the nation in the forthcoming future, including DEI hiring practices by private employers under Title VII. New Jersey historically has more broadly sought to eliminate discrimination than has Title VII and has more broadly construed the test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), when deciding wrongful termination cases:

> When the employee is alleging a discriminatory discharge, the *prima facie* case is established as follows: the employee must prove "[1] that he was in the protected * * * group, [2] that he was performing his job at a level that met his employer's legitimate expectations, [3] that he nevertheless was fired, and [4] that [the employer] sought someone to perform the same work after he left." .... Once the *prima facie* case has been established, the *McDonnell Douglas* analysis is followed in all other respects.

*Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 597 (1988).

Under the LAD, color, race, disability, gender, and sexual orientation all are protected classes which have been alleged by Mr. Dzibela.

## A.    Race/Color/Gender/Sexual Orientation (Counts 1, 2, 5 & 6)

Mr. Dzibela has alleged that Fink compelled BlackRock to engage in

discriminatory practices related to hiring, employee retention, and compensation. The DEI policies continued throughout Mr. Dzibela's employment such that the conditions never abated, as reflected in Fink's annual letters. (TAC ¶22) Such policies "promoted and expressly or implicitly mandated elimination of employees who were white, male, and heterosexual, and/or discrimination against them in their compensations as part of a campaign surrounding corporate governance at BlackRock, and generally among publicly-traded corporations over which BlackRock held sway based on its multiple trillion dollars of investment capital ..." (Id.) Such illegal policies were essentially made at Fink's command (TAC ¶23)

Indeed, as Mr. Dzibela's production went up, his bonus compensation remained flat because of defendant's reliance on discreet factors such as race, gender, and sexual orientation, (TAC ¶¶28-31). In 2022, Mr. Dzibela had an "Outperform" rating for both 2020 and 2021, yet he received a reduced bonus in 2022 due to his race, color, medical status, perceived disability, gender, sexual orientation etc. (TAC ¶¶52-53) Indeed, as Mr. Dzibela was passed over for promotion despite his success, he noted to management "that he obviously was not fitting the 'criteria' for advancement," being the 'right' race, sex, and sexual orientation. (TAC ¶33) Mr. Dzibela's desk had record profits in 2020, such that terminating him at that time to satisfy DEI head counts and for retribution due to Mr. Dzibela's open questioning of Fink's ESG policies  was not reasonably feasible (TAC ¶¶28-31; 52-53).

Certainly, the combination of flat or reduced compensation for Mr. Dzibela while production was rising, being passed over for promotion, and defendants' openly stated DEI policies which came directly from CEO and President Fink at the top, leads to the reasonable inference of discrimination which continued right up until Mr. Dzibela's termination.

Defendants wish this Court only to focus on the vaccine mandate as the reason for termination. However, the TAC tells a different story; one where the vaccine mandate was an obvious excuse for defendants finally to have what they believed was a defensible reason for terminating Mr. Dzibela, which they had long wished to do for reasons of Mr. Dzibela not fitting the criteria of a DEI employee, and due to his open objections to Fink's ESG policies. (TAC ¶¶46, 48) With respect to the impact of DEI--Mr. Dzibela has alleged that "defendants desired to replace Mr. Dzibela with a person who was not a white male, and who did not question defendants' ESG investing." (TAC ¶48)

The vaccine mandate provided defendants with a built-in excuse for terminating employees who did not fit the desired DEI profile, or who otherwise did not 'toe the line' on Fink's treasured ESG policy.[5] In Mr. Dzibela's case, the mandate was transparently only an excuse for his termination. Mr. Dzibela had a medical

---

[5] Moreover, BlackRock's vaccine mandate was a financial boon for the company, which had stockpiled shares of Moderna, a start-up company prior to the pandemic, before the first case of COVID-19 existed in the United States. (TAC ¶¶36-37)

exemption letter from his medical doctor due to a pre-existing health condition which placed him at risk adverse health consequences if he was to take the COVID-19 shot. (TAC ¶¶43-44) Moreover, Mr. Dzibela was already working from home, meaning that accommodating his medical exemption needs would have been of no moment to BlackRock. (TAC ¶¶34-35, 47) Yet defendants denied Mr. Dzibela's medical exemption and refused to accommodate it. (TAC ¶¶45-48) Defendants refused such exemption and accommodation because of the DEI and ESG issues related to Mr. Dzibela. (TAC ¶¶47-48) Mr. Dzibela even resubmitted his medical exemption to an outside BlackRock consultant. Once again, the exemption was denied without explanation. When Mr. Dzibela's attempted to find out who the purported outside consultant was who made such determination, Mr. Dzibela was not provided with such information. (TAC ¶¶49-51)

Moreover, Mr. Dzibela's termination purportedly due to the vaccine mandate came after the United States Supreme Court ruled against the continued imposition of the employer mandate that had been imposed by the Biden Administration. (TAC ¶54) Thus, the legality of the BlackRock mandate was certainly in question at the time, yet defendants ensured that Mr. Dzibela would be terminated nonetheless. Adding insult to injury, defendants claimed that Mr. Dzibela "resigned" and that he was not terminated. (TAC ¶56)[6]

---

[6] Although at the outset of their brief defendants initially continued the charade that Mr. Dzibela was not terminated, but rather that his "employment ended," and that

Finally, after Mr. Dzibela was terminated, he learned that he was replaced by others who had inferior technical skills, yet who "better fit defendants' discriminatory DEI policy preferences." (TAC ¶¶61-62)

Contrary to defendants' assertion that the discrimination against Mr. Dzibela merely constituted discrete acts, most of which allegedly are beyond the statute of limitations (Db 12; 19-21), the discrimination against Mr. Dzibela constitutes a classic continuing violation. *See Alexander v. Seton Hall University*, 204 N.J. 219, 229 (2012) (internal quotations omitted) ("when the complained-of conduct constitutes a series of separate acts that collectively constitute one unlawful employment practice, the entire claim may be timely if filed within two years of the date on which the last component act occurred.") Defendants had a severe and pervasive discriminatory DEI policy which caused Mr. Dzibela to suffer numerous individual problems during his employment, which ultimately led to his termination. But for the overarching discriminatory DEI policy, none of the problems Mr. Dzibela encountered during the entire time period of the DEI policy being in effect would likely have occurred. In other words, the discriminatory DEI policy was a common thread running through all the employment problems Mr. Dzibela had, which

---

he had a "separation from employment," (Db 1), all such pretense was dropped later in the brief, where defendants boldly address at the commencement of point heading D.2 **"Plaintiff's termination in 2022 ..."** The first paragraph of the sub-point then leaves no room for doubt that defendants admit their lie, when they write, "Plaintiff also cannot state a *prima facie* case under CEPA without showing that his alleged protected activity **caused his termination**." (Emphasis added)

culminated in his termination. The termination date, thus, started the clock running on the statute of limitations.

As a result, it is amply demonstrated that TAC's allegations sufficiently allege facts demonstrating a *prima facie* case (1) that Mr. Dzibela was in several protected groups, (2) that he had an "Outperform" rating at his job which exceeded his employer's legitimate expectations; (3) that he nevertheless was terminated from his employment; and (4) that the employer hired more 'DEI friendly' candidates, in keeping with Fink's insistence that race, sex, gender, and sexual orientation are legitimate hiring criteria despite the LAD and Title VII saying otherwise. Thus, plausible claims of color, race, gender, and sexual orientation discrimination have been pled by Mr. Dzibela.

### B.    Disability/Perceived Disability (Count 3)

Even if defendants' vaccine mandate was not a sham in the case of Mr. Dzibela, which it was, Mr. Dzibela asserts that he was the victim of disability discrimination. He was unable to receive the vaccine based on medical advice of his doctor and he already was working from home. Defendants denied his medical accommodation without any basis, since Mr. Dzibela already was working from home and, thus, could easily have had his medical condition accommodated.

As noted, the LAD is more broadly construed that its federal equivalents. Regarding religious accommodations under Title VII, in *Groff v. DeJoy*, 143 S. Ct. 2279, 2294 (2023) (emphasis added), the United States Supreme Court just recently

22

held:

> We hold that showing "more than a *de minimis* cost," as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII. *Hardison* cannot be reduced to that one phrase. In describing an employer's "undue hardship" defense, *Hardison* referred repeatedly to "substantial" burdens, and that formulation better explains the decision. **We therefore, like the parties, understand *Hardison* to mean that "undue hardship" is shown when a burden is substantial in the overall context of an employer's business.** See Tr. Of Oral Arg. 61-62 (argument of Solicitor General). This fact-specific inquiry comports with both *Hardison* and the meaning of "undue hardship" in ordinary speech.

Once again, the United States Supreme Court has planted a firm stake in the ground against discrimination. Although *Groff* concerned religious accommodations, there again is no reason to believe that medical accommodations will ultimately not receive the same treatment, federally. Given that New Jersey leads on discrimination with the LAD, it is virtually certain that the same standard will be applied under the LAD as well.

The New Jersey Supreme Court already is more advanced than the United States Supreme Court with respect to failure to accommodate actions. For instance, whereas the United States Supreme Court has yet to formally decide that there need not be an adverse employment action taken by an employer in conjunction with a failure to accommodate disability case under the ADA, under the LAD, the New Jersey Supreme Court has adopted the Tenth Circuit's standard that "an adverse employment action is not a requisite element of a failure-to-accommodate

claim," *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 792 (10th Cir 2020) (en banc), by specifying that "[i]t is time to close debate on the elements of a failure-to-accommodate claim under the LAD ... [w]e now formally hold that an adverse employment action is not a required element for a failure-to-accommodate claim." *Richter v. Oakland Bd. of Educ.*, 246 N.J. 507, 529-530 (2021).

Mr. Dzibela already worked from home. He had a medical condition that precluded him from taking the COVID-19 shot per his own New Jersey licensed medical doctor. Defendants denied Mr. Dzibela an exemption from the mandate and refused to provide him even with the accommodation of working from home. Such accommodation would have been eminently reasonable and plainly would not have caused defendants a hardship which was substantial in the overall context of BlackRock's business. Instead, an unidentified person who may not have been medically trained simply denied Mr. Dzibela an accommodation and terminated him without accommodation due to his medical inability to get the COVID-19 shot.

Under the circumstances, Mr. Dzibela has amply demonstrated the plausibility of his claim for disability discrimination under the LAD.

### C.    Hostile Work Environment (Count 7)

Defendants' incessant focus on DEI and the impact it had on Mr. Dzibela's employment, ultimately leading, in whole or in part, to his termination, created an actionable hostile work environment. Mr. Dzibela's claim to such effect is plausible.

To state a claim for hostile work environment, a plaintiff must allege that the

complained-of conduct: (1) would not have occurred but for the employee's inclusion in category protected by the LAD; and it was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Rios v. Meda Pharm., Inc.*, 247 N.J. 1, 10 (2021).

Defendants ask this Court to find that Mr. Dzibela's hostile work environment claim "is premised upon discrete act…" (Db 19). Nothing could be further from the truth.

Mr. Dzibela was a white, heterosexual male in a corporate culture where white, heterosexual males were at least the implicit object of discriminate DEI targeting. Fink "set policies which promoted and expressly or implicitly mandated elimination of employees who were white, male and heterosexual and/or discrimination against them in their compensation as part of a campaign surrounding corporate governance at BlackRock…" (TAC ¶22) Thus, BlackRock's corporate culture was infused with discrimination against Mr. Dzibela which was systemic, continuous, severe, and pervasive. Certainly, a reasonable person in Mr. Dzibela's position would believe such conditions to be abusive.

That Mr. Dzibela actually had experiences which are alleged to be particular instances of such discrimination against him, in terms of compensation, promotion, and termination, actually amplifies Mr. Dzibela's hostile work environment claim. Indeed, when being passed over for promotion as a result of defendants DEI policies,

in frustration Mr. Dzibela spoke to management and noted "that he obviously was not fitting the 'criteria' for advancement, implying that he was not the 'right' race, sex, and sexual orientation." (TAC ¶33) The overarching discriminatory policies caused daily pressure on Mr. Dzibela as a target of those policies, and Mr. Dzibela felt the effects of such policies on numerous occasions. Thus, Mr. Dzibela has alleged that the hostile work environment (1) would not have occurred but for defendants' open discriminatory policies that were put into practice by Fink across BlackRock; (2) that such policies and practices were severe or pervasive enough to make (3) Mr. Dzibela, as a reasonable person, believe that (4) the conditions of employment were altered and the working environment was hostile or abusive. Consequently, a plausible claim for hostile work environment has been pled.[7]

### D.    Intentional Infliction of Emotional Distress (Count 8).

Defendant contends that Mr. Dzibela's Intentional Infliction of Emotional Distress ("IIED") claim cannot co-exist with his LAD claims, and must be dismissed. (Db. 23-25) However, such claim is pled in the alternative. The

---

[7] Although believing such claims to be viable, the plaintiff hereby abandons the Fourth Count of the TAC, alleging Predisposing Genetic Characteristics discrimination, the Ninth Count alleging a violation of the Conscientious Employee Protection Act, *N.J.S.A.* 34:19-1 *et seq.*, and the Tenth Count seeking a Declaratory Judgment. That said, facts pled within the Tenth Count still are relevant to this action as they set forth absolute factual information about the vaccines that BlackRock had or showed have had when imposing its mandate.

Complaint originally was filed in the Superior Court of New Jersey. Under *R.* 4:5-2, New Jersey provides for alternative pleading in a Complaint. Removal to the District Court changes nothing, since *Fed.R.Civ.P.* 8(a)(3) does the same.

In *Catalane v. Gilian Instrument Corp.*, 271 N.J. Super. 476, 492 (App. Div. 1994), when confronted with alternative LAD and IIED claims, the Appellate Division held that the IIED claim should not go to the jury if an LAD claim remained. However, at the pleading stage, it is appropriate to plead in the alternative since, theoretically, the LAD claims could be dismissed. If so, and if the IIED claim was viable but had been dismissed on "choice of law" grounds, Mr. Dzibela will be improperly deprived of a remedy. Thus, at this time, the IIED claim should proceed, while recognizing that if the LAD claim goes to a jury, the IIED claim may not go with it to that jury.

Defendants also claim that Mr. Dzibela has not stated an IIED claim. (Db25-28). Such argument must fail.

In *Soliman v. Kushner Companies, Inc.*, 433 N.J. Super. 153, 177 (2013), the New Jersey Supreme Court noted as follows:

> To make out a *prima facie* case of intentional infliction of emotional distress, a plaintiff must show that: (1) the defendant acted intentionally; (2) the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community;" (3) the defendant's actions proximately caused him/her emotional distress; and (4) the emotional distress was "so severe that no reasonable [person] could be expected to endure it."

In the present case, defendants intentionally set policy which it knew was discriminatory against white, heterosexual males. They further intentionally set policy which required COVID-19 shots at defendants' whim, even if an employee, like Mr. Dzibela, had a medical excuse not to take the shot since it could cause him serious medical harm. Indeed, defendants ultimately did terminate Mr. Dzibela while knowing him to have a medical reason not to be vaccinated, per his medical doctor, and while he already worked from home, such that he was not going to expose any other BlackRock employee or officer to COVID-19 should he be infected.[8] The demand that Mr. Dzibela choose between his job and a shot which medically could kill him or cause him serious medical harm certainly was outrageous and extreme, crossed all bounds of decency, and was intolerable in a civilized society. The result was that Mr. Dzibela suffered with unendurable emotional distress. Consequently, Mr. Dzibela has made out a *prima facie* case for IIED.

### E.    Fink is properly named as a defendant.

Fink is the architect and the chief enforcer of the discriminatory policies which resulted in Mr. Dzibela's injuries under the LAD. Fink promulgated and enforced discriminatory DEI measures across all levels of BlackRock, and proudly bragged about his enforcement of such mandates in open letters he published annually. (TAC

---

[8] In any regard, the record reflects that the COVID-19 shots neither prevent those receiving it from contracting COVID-19 or from spreading it to others, and that those receiving such shots still may die from COVID-19. (TAC, Count Ten §§38-42)

§22) Indeed, Fink openly fancied himself as a sort of Master of the Universe who used his position, influence, and financial power to force corporations throughout the United States to engage in discriminatory DEI efforts which targeted white, heterosexual, males.[9] (TAC §§22-23, 25-27) Under the LAD, which broadly reaches all individuals in an employment setting who are responsible for discrimination, Fink plainly is an appropriately-named defendant.

Recently, in *Rios v. Meda Pharm., Inc.*, 247 N.J. 1, 12 (2021), the New Jersey Supreme Court noted the expansive nature of individual liability under the LAD. Although *Rios* was a sexual harassment case, the LAD does not distinguish between different types of discrimination by providing different legal standards for different discriminatory acts. Thus, the Court in *Rios* wrote (emphasis added):

> In the context of conduct that may give rise to vicarious liability for a hostile work environment, an "expansive definition of 'supervisor'" applies. *Aguas v. State*, 220 N.J. 494, 528-29 (2015) (claim based on sexual harassment); *see Lehmann*, 132 N.J. at 619-20 (same). That approach draws attention to **individuals who "direct the day-to-day responsibilities of subordinates" as well as higher-level management.** *Aguas*, 220 N.J. at 528-29.

While Fink was not responsible for overseeing Mr. Dzibela's day-to-day employment, he was *the* "higher-level management" individual who was most responsible for the discrimination experienced by Mr. Dzibela. Moreover, Fink is liable even after application of the "aiding and abetting" standard of the LAD is

---

[9] Of course, the white heterosexual male Fink was exempt from his own discriminatory policies.

applied, as noted by defendants. (Db35). More specifically, in *Cicchetti v. Morris County Sheriff's Office,* 194 N.J. 563, 594 (2008) (internal quotations omitted), the New Jersey Supreme Court noted that aiding and abetting requires "active and purposeful conduct" and application of the following criteria:

> [I]n order to hold an employee liable as an aider or abettor, a plaintiff must show that (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

Here, Fink "aided" all supervisors by performing the wrongful act of **compelling them to discriminate against white heterosexual males** in all aspects of employment, from hiring to compensation to promotion to firing. Fink was the *sine qua non* of discriminatory DEI at BlackRock. Fink was not only aware of his role, but he also proudly wrote and spoke about it both internally and externally. (TAC ¶22) More than substantially assisting the principal violation, Fink caused others at BlackRock to assist him in engaging in such discriminatory conduct. He thus aided and abetted the discrimination in a manner which more than satisfies the employer liability standard of the LAD.

Moreover, with respect to the IIED claim, Fink also remains potentially liable to Mr. Dzibela. As President and CEO of BlackRock, Fink reasonably can be presumed to have engineered BlackRock's massive investment in startup Moderna, whereby 10,000,000 shares were on BlackRock's balance sheet before the first case

of COVID-19. Such purchase, and BlackRock's ownership of large stakes in other vaccine manufacturers, provided BlackRock with a tremendous financial incentive to compel vaccination, and promoted vaccines. (TAC §§36-42) As a result, BlackRock knew that employees would be shed, yet Fink raked in record compensation by sacrificing them for the vaccines. During such time, Mr. Dzibela's compensation was flat, or fell, because of DEI, and he ultimately was terminated. (TAC §§25-30)

For such reasons, the claims against Fink, personally, are plausible and appropriate.

## CONCLUSION

Based on the foregoing, Mr. Dzibela has demonstrated that plausible claims exist with the Third Amended Complaint, including against Fink, which require denial of the Motion to Dismiss. The only dismissal should be with respect to the Fourth, Ninth, and Tenth Counts, which Mr. Dzibela is voluntarily dismissing.

Respectfully submitted,

MURRAY-NOLAN BERUTTI LLC

*s/ Ronald A. Berutti*

By:_____
    Ronald A. Berutti

Dated: September 15, 2023